**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **CRIMINAL ACTION FILE** |
| | **:** | |
| **ARTIS LISBON,** | **:** | **NO.  1:10-CR-251-10-TWT/AJB** |
| | **:** | **(Second Superseding)** |
| **Defendant.** | **:** | |

**ORDER FOR SERVICE OF**
**REPORT AND RECOMMENDATION**

Attached is the Report and Recommendation ("R&R") of the United States

Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and

N.D. Ga. CrR. 58.1(A)(3)(a), (b).  Let the same be filed, and a copy of the R&R,

together with a copy of this Order, shall be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections to the

R&R within **fourteen (14)** days of service of this Order.  Should objections be filed,

they shall specify with particularity the alleged error(s) made (including reference by

page number to the transcript if applicable) and shall be served upon the opposing

party.  *See United States v. Gaddy*, 894 F.2d 1307, 1315 (11th Cir. 1990).  The party

filing objections will be responsible for obtaining and filing the transcript of any

evidentiary hearing for review by the District Court.  Failure to object in accordance with this rule waives a party's right to review.  Fed. R. Crim. P. 59(b)(2).

Pursuant to 18 U.S.C. § 3161(h)(1)(H), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act ("the Act"), whether or not objections are actually filed.**  If objections to this R&R are filed, the Clerk is **DIRECTED** to **EXCLUDE** from the computation of time all time between the filing of the R&R and the submission of the R&R, along with any objections, responses and replies thereto, to the District Judge.  18 U.S.C. § 3161(h)(1)(D), (H); *Henderson v. United States*, 476 U.S. 321, 331 (1986);  *United States v. Mers*, 701 F.2d 1321, 1337 (11th Cir. 1983).  The Clerk is **DIRECTED** to submit the R&R with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED and DIRECTED**, this  13th  day of   October  , 2011.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **CRIMINAL ACTION FILE** |
| | **:** | |
| **ARTIS LISBON,** | **:** | **NO.  1:10-CR-251-10-TWT/AJB** |
| | **:** | **(Second Superseding)** |
| **Defendant.** | **:** | |

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Defendant Lisbon has filed a motion, an amended motion, and a second amended motion to suppress evidence, [Docs. 178, 194, 256], as to which the Court held evidentiary hearings on April 13, 2011, [Doc. 257] ("T1-__") and June 16, 2011, [Doc. 285] ("T2-__"). The parties then filed post-hearing briefs. [Docs. 266, 271, 292, 293]. With briefing concluded, the motions are now ripe for recommended resolutions. For the following reasons, the undersigned **RECOMMENDS** that the motions be **DENIED**. In addition, Lisbon filed a motion for severance, [Doc. 180], which the undersigned **RECOMMENDS** be **DENIED**.

AO 72A
(Rev.8/8
2)

## Motions to Suppress

Lisbon filed motions to suppress seeking to exclude evidence seized from searches conducted by warrant at 1899 Trotti Street, Atlanta, Georgia (hereinafter "Trotti"), 335 W. Ponce De Leon Avenue, Unit 210, Decatur, Georgia (hereinafter "W. Ponce"), and three safe deposit boxes, as well as a warrantless search of W. Ponce and an automobile located there. The Court previously concluded that Lisbon was not entitled to an evidentiary hearing as to the searches conducted by warrant at Trotti and W. Ponce. [Doc. 242]. Because that order was issued to set evidentiary hearings (as discussed *infra*), the Court repeats its prior analysis for purposes of review by the District Court and discusses the issues that remain to be decided following the evidentiary hearings and briefing.

I.   ***Searches as to which Lisbon was not entitled to an evidentiary hearing***:

    A.   **1899 Trotti Street, Atlanta, Ga. (No. 1:10-MJ-728-LTW, issued June 10, 2010) [Doc. 203-1].**

The Court previously concluded that Lisbon was not entitled to an evidentiary hearing on the execution of the search warrant at Trotti. Lisbon objected to the search conducted at Trotti on three grounds. He argued that (1) the search warrant lacked particularity, (2) the executing agents exceeded the scope of the search warrant when

AO 72A
(Rev.8/8
2)

they seized "miscellaneous paperwork" from that location and searched a Pontiac automobile on the premises at the time of the search, [Doc. 194 at 12-13]; and (3) the agents lacked probable cause to search the Pontiac. [*Id.* at 14].

The Court rejected each argument. First, Lisbon did not establish "standing" to contest the Trotti Street search. *See Rakas v. Illinois*, 439 U.S. 128, 133-34, 143 (1978); *United States v. Cooper*, 203 F.3d 1279, 1284 (11th Cir. 2000).[1] One's standing to challenge governmental actions on Fourth Amendment grounds is a threshold question. *United States v. McBean*, 861 F.2d 1570, 1573 (11th Cir. 1988). A defendant bears the burden of showing a legitimate expectation of privacy in the area searched. *United States v. Brazel*, 102 F.3d 1120, 1147-48 (11th Cir. 1997); *United States v. Ramos*, 12 F.3d 1019, 1023 (11th Cir. 1994). To have standing to challenge a search, one must manifest a subjective expectation of privacy in the invaded area that "society is prepared to recognize as reasonable." *Rakas*, 439 U.S. at 143 & n.12; *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998). A defendant must establish both a

---

[1]     The undersigned recognizes that the Supreme Court disapproves of the use of the word "standing" in this context. *See Rakas*, 439 U.S. at 139-40; *see also United States v. Hawkins*, 681 F.2d 1343, 1344-45 (11th Cir. 1982). However, the undersigned will use the word "standing" when referring to whether Defendant has an expectation of privacy because courts routinely use "standing" as "shorthand for the existence of a privacy or possessory interest sufficient to assert a Fourth Amendment claim." *United States v. Daniel*, 982 F.2d 146, 149 n.2 (5th Cir. 1993).

3

subjective and an objective expectation of privacy. *United States v. Segura-Baltazar*, 448 F.3d 1281, 1286 (11th Cir. 2006); *United States v. Robinson*, 62 F.3d 1325, 1328 (11th Cir. 1995).  " 'The subjective component requires that a person exhibit an actual expectation of privacy, while the objective component requires that the privacy expectation be one that society is prepared to recognize as reasonable.' " *Robinson*, 62 F.3d at 1328; *see also Cooper*, 133 F.3d at 1398.  Also, the individual's expectation, viewed objectively, must be justifiable under the circumstances. *Smith v. Maryland*, 442 U.S. 735, 740-41 (1979).  A bare claim that an individual has an interest in the items seized during a search, however, is insufficient to establish that his or her Fourth Amendment rights were implicated by a search. *United States v. Chaves*, 169 F.3d 687, 690 (11th Cir. 1999).  Courts assess on a case-by-case basis the "standing" of a particular person to challenge an intrusion by government officials into an area over which that person lacked primary control. *Oliver v. United States,* 466 U.S. 170, 191 n.13 (1984).  The subjective prong is a factual inquiry. *United States v. McKennon*, 814 F.2d 1539, 1543 (11th Cir. 1987); *see also United States v. Jones*, 184 Fed. Appx. 943, 947 (11th Cir. June 22, 2006).  The objective prong is a question of law. *McKennon*, *id.*

4

AO 72A
(Rev.8/8
2)

Lisbon first argued in his brief that he had a legitimate expectation of privacy in the residence because although it was his father's, he kept belongings, including his vehicle, at the residence. [Doc. 194 at 8]. It is true that "even where a defendant does not own the property searched, he or she may nonetheless have a reasonable expectation of privacy in that place by virtue of his or her relationship with that place." *Chaves*, 169 F.3d at 690. For example, the Supreme Court has held that an overnight guest in a house of a third party has a reasonable expectation of privacy. *Minnesota v. Olson*, 495 U.S. 91, 96-100 (1990). However, as the Supreme Court has affirmed, not everyone "who is merely present with the consent of the householder" may necessarily be able to challenge a search of the premises. *Minnesota v. Carter*, 525 U.S. 83, 90 (1998) (citing *Rakas*, 439 U.S. 128). In *Carter*, the Supreme Court in fact declined to find that a visitor to a residence, present for only a short period of time and for the purpose of conducting illicit drug transactions, without any known prior connection to the residence, had a reasonable expectation of privacy to contest a search of the residence. *Carter*, *id.* at 90-91.

AO 72A
(Rev.8/8
2)

The allegations asserted in Lisbon's brief[2] were insufficient to establish standing since they failed to demonstrate that Lisbon had "an unrestricted right of occupancy or custody and control of the premises" that would create a legitimate expectation of privacy in the residence.  *United States v. Cossio*, 336 Fed. Appx. 909, 912 (11th Cir. July 8, 2009) (quoting *United States v. Baron-Mantilla*, 743 F.2d 868, 870 (11th Cir. 1984)); *see also United States v. Torres*, 705 F.2d 1287, 1294-95 (11th Cir. 1983), *vacated en banc, consideration pending remand to panel*, 718 F.2d 998 (11th Cir. 1983), *remanded*, 720 F.2d 1506 (11th Cir. 1983), *on appeal after remand*, 741 F.2d 1323 (11th Cir. 1984) (where appellants were house guests of searched house, ate, slept and showered there, stored personal belongings there and were the only guests in house at time of search, appellants would have standing to challenge search); *United States v. Garcia*, 741 F.2d 363, 366 (11th Cir. 1984) (although appellant had more than tenuous interest in searched apartment, appellant had no standing where connections were not regular or personal enough to find that appellant adopted apartment as a place of business or as a residence).  Since these allegations did not allege facts that if proved

---

[2]     The Court did not need to address the government's argument that Lisbon's showing as to standing was procedurally inadequate for failing to include an affidavit, [*see* Doc. 203 at 5], because even if Lisbon had submitted an affidavit swearing to the assertions in the brief, he still would not have established standing.

would require the grant of relief, the Court held that an evidentiary hearing on the issue of standing was not warranted.  *Cooper*, 203 F.3d at 1285 (quoting *United States v. Sneed*, 732 F.2d 886, 888 (11th Cir. 1984)).

The former Fifth Circuit's discussion in *United States v. Haydel*, 649 F.2d 1152 (5th Cir. Unit A July 1981),[3] upon which Lisbon relied, demonstrates the inadequacy of Lisbon's showing on standing.  In *Haydel*, the evidence established that the defendant's parents had given him permission to use their home and had given him a key, causing the court to conclude that his access was for all practical purposes unencumbered.  *Id.* at 1155.  Although the defendant in *Haydel* did not reside regularly at his parents' home, he kept clothing there and had occasionally remained overnight, when he and his wife had domestic problems.  *Id.* & n.2.  Unlike *Haydel*, Lisbon's statements that he kept belongings there are insufficient to establish the requisite legitimate expectation of privacy in the premises, as explained below.

In an affidavit filed with his reply brief, Lisbon testified that "one of the businesses [he] was involved in was Trotti Used Car Sales, Inc., a Georgia Corporation with its principal office and place of business at 1899 Trotti Street," and that he

---

[3]     In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

AO 72A
(Rev.8/8
2)

"had an office in the residence at 1899 Trotti Street where [he] kept property." [Doc. 207-1 at 3].[4]   These ambiguous statements are similarly insufficient to satisfy his burden to demonstrate standing in the Trotti property.  Individuals may have a "reasonable expectation of privacy against intrusions by police" into their offices.  *O'Connor v. Ortega*, 480 U.S. 709, 716 (1987) ("Within the workplace context, . . . an expectation [of privacy] in one's place of work is based upon societal expectations that have deep roots in the history of the Amendment." (citations and internal quotation marks omitted)).  But, unlike the nearly absolute protection of a residence, the "great variety of work environments" requires analysis of reasonable expectations "on a case-by-case basis."  *Id.* at 718.  The Fourth Amendment inquiry hinges on whether the area or thing "searched was one in which there was a reasonable expectation of freedom from governmental intrusion."  *Mancusi v. DeForte*, 392 U.S. 364, 368 (1968).  The corporate employee, moreover, must demonstrate a sufficient "nexus between the area searched and [his] own work space."  *United States v. Britt*, 508 F.2d 1052, 1056 (5th Cir. 1975); see also Wayne R. Lafave et al., 3 *Criminal Procedure* § 9.1(c) (3d ed. Nov. 2010) ("Consistent with *Mancusi*, courts have held that

---

[4]      He also testified that on June 10, 2010, a Pontiac G8 automobile titled in his name was parked at the premises.  [Doc. 207-1 at 3].

8

a corporate or individual defendant in possession of the business premises searched has standing, and that an officer or employee of the business enterprise has standing if 'there was a demonstrated nexus between the area searched and the work space of the defendant.' ") (footnotes omitted). Because Fourth Amendment rights are personal in nature, "an individual cannot assert a corporation's Fourth Amendment rights absent a showing that he had an independent privacy interest in the good seized or the area searched." *United States v. Vicknair*, 610 F.2d 372, 379 (5th Cir. 1980). Although an analysis of a legitimate expectation of privacy in business premises necessarily must be determined on a case-by-case basis, there are several considerations that provide guidance:

> Generally, courts tend to find that these elements are sufficiently established when the area searched is set aside for the defendant's exclusive use, such as an individual office. However, courts are more skeptical of standing claims when the defendant only occasionally used the area searched. The greater the degree of exclusivity and control over a work area, and the more time a defendant spends there, the more likely standing is to be found. By contrast, the less private a work area - - and the less control a defendant has over that work area - - the less likely standing is to be found.

*United States v. Hamdan*, 891 F. Supp. 88, 94-95 (E.D.N.Y. 1995) (citations omitted).

For example, in *Henzel v. United States*, 296 F.2d 650 (5th Cir. 1961), the former Fifth Circuit held that the sole stockholder and president of a corporation had standing to

9

challenge the seizure of corporate books and records when the individual had prepared much of the confiscated material, which was kept in his office along with his personal belongings. *Id.* at 653. In *Chaves*, the Eleventh Circuit found that the defendant had standing to contest a search of the warehouse, where he possessed the only key and he kept business and personal papers in the warehouse. *Chaves*, 169 F.3d at 691.

Lisbon did not submit any evidence to support a conclusion that he exercised "a measure of control and ability to exclude others" as to the Trotti property. His statement that he was "involved" in the business at that address does not satisfy his burden. "[A] motion to suppress must in every critical respect, including allegations of standing, be 'sufficiently definite, specific, detailed, and nonconjectural to enable the [C]ourt to conclude that a substantial claim is presented.' " *United States v. Ford*, 34 F.3d 992, 994 (11th Cir. 1994) (quoting *United States v. Eyster*, 948 F.2d 1196, 1208-09 (11th Cir. 1991), and *United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir. 1985)); *see also Cooper*, 203 F.3d at 1285 (holding that an evidentiary hearing on the issue of standing is not necessary unless the defendant alleges facts in his motion sufficient to establish his standing).

On the other hand, the Court concluded that Lisbon has standing to challenge the search of the Pontiac searched at the Trotti residence. *See United States v. Borno*,

10

946 F. Supp. 972, 977 (M.D. Fla. 1996) (recognizing that vehicle owner may contest its search); *see also United States v. Salvucci*, 448 U.S. 83, 91 (1980) (recognizing that "property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated").

Second, even if Lisbon had properly asserted standing to challenge the Trotti search, he would not be entitled to an evidentiary hearing on his motion to suppress. As to his challenge to the search of a Pontiac automobile in the garage, circuit precedent authorizes the search of a vehicle on the premises during the execution of a search warrant:

> Many courts have held that a warrant describing the premises includes the vehicles parked on the property so described. In *United States v. Singer*, 970 F.2d 1414, 1417-18 (5th Cir. 1992), the Fifth Circuit affirmed a trial court's decision refusing to suppress evidence obtained from a search of two automobiles located on the property of a residence for which a search warrant was issued. In affirming the lower court, the Circuit Court explained that "[t]his court has consistently held that a warrant authorizing a search of 'the premises' includes vehicles parked on the premises." *Singer*, 970 F.2d at 1418 (citing *United States v. Cole*, 628 F.2d 897, 899 (5th Cir. 1980) (additional citations omitted) . . . .

> There is binding precedent in this circuit holding that a search of the premises includes vehicles parked on the premises. *See United States v. Napoli*, 530 F.2d 1198, 1200 (5th Cir. 1976) ("We conclude that the search of the camper was authorized by the warrant. We think that the reference to 'on the premises known as 3027 Napoleon Avenue' was sufficient to embrace the vehicle parked in the driveway on those premises.").

11

Those reasons apply in the instant case.  The Search Warrant describing the premises as Route 4, Box 133 Rolling Hills Circle, Ozark, Alabama, was sufficient to embrace the Lexus parked in the driveway on those premises.  For this reason, the court adopts the Magistrate's Recommendation as to the search of the Lexus.

*United States v. Ridolf*,  76 F. Supp. 2d 1305, 1311 (M.D. Ala. 1999); *see also United States v. Cole*, 628 F.2d 897 (5th Cir. 1980), where the court wrote:

In [*Napoli*], this court held that a warrant to search "premises known as" a particular address and described as a residential dwelling conferred authority to search a camper parked in the driveway.  Here the warrant referred to "premises described as" a family dwelling, "being the rear apartment" of a particular address.  There is no significant difference in the terms of the two warrants.  Under *Napoli*, therefore, appellant's truck, parked in a carport attached to the rear apartment, was within the scope of the warrant.[ ]  The officers were thus authorized to search the truck, limited only by the nature of what they were searching for.  *See Walter v. United States*, 447 U.S. 649, -- (1980); *Harris v. United States*, 331 U.S. 145, 152 (1947).  Both the hat (in which the gun was found) and the attache case (in which the silencer was found) might have contained drugs.  The officers thus did not exceed the scope of the warrant in searching those items.  The convictions on counts one through four, based on the pen gun and the silencer, must be affirmed.

*Cole*, 628 F.2d at 899-900 & n.3 (citing *United States v. Anderson*, 485 F.2d 239 (5th Cir. 1973) (warrant for premises held to include flower bed outside house); *United States v. Long*, 449 F.2d 288 (8th Cir. 1971) (warrant for premises held to include outside trash barrel); *Brooks v. United States*, 416 F.2d 1044 (5th Cir. 1969) (warrant for lot and cabin held to include automobile parked near cabin)).  As a result, in order

12

to lawfully search the Pontiac automobile in the course of searching Trotti, the executing agents did not need any probable cause independent of that supporting the search warrant for the premises.  Therefore, the Court concluded that Lisbon was not entitled to an evidentiary hearing because the Pontiac was properly searched as part of the execution of the Trotti search warrant.

Next, the Court held that the Trotti warrant was not in violation of the Fourth Amendment's particularity requirement.  The search warrant authorized the following items at the location to be searched for and seized:

1.   Cocaine and other controlled substances

2.   U.S. Currency

3.   Firearms

4.   Jewelry

5.   Ledgers and other drug records

6.   Cellular telephones, SIM cards, Laptops, Blackberries, and other similar devices capable of sending and receiving emails or text messages, including their contents

7.   Drug paraphernalia, including but not limited to scales, kilo presses, and materials for packaging drugs and drug money

8.   Indicia of identity and/or occupancy, such as identification documents and mail.

13

*See* Exhibit A to Search Warrant located at Doc. 203-1 at 3.  The face page of the warrant, below the typed entry of "Exhibit A," contained the following handwritten notation:

> which is property which constitutes evidence of violations of 21 U.S.C. §§ 841 and 846.

[Doc. 203-1 at 2].  Lisbon argued that the term "identification documents and mail" is too open-ended to satisfy the Fourth Amendment's particularity requirement.  [Doc. 194 at 22].

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing* the place to be searched, and the persons or *things to be seized*."  (emphasis added).  "This requirement is aimed at preventing 'general, exploratory rummaging in a person's belongings.' "  *United States v. Wuagneux*, 683 F.2d 1343, 1348 (11th Cir. 1982) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)).  The requirement for particularity "ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit."  *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).  A warrant which fails to sufficiently particularize the place to be searched or the things to be seized is

14

unconstitutionally overbroad and the resulting general search is unconstitutional. *Stanford v. Texas*, 379 U.S. 476, 512 (1965).   In order to deter such warrants and searches, any evidence so seized must be excluded from the trial of the defendant. *Stone v. Powell*, 428 U.S. 465, 486 (1976); *United States v. Travers*,  233 F.3d 1327, 1329 (11th Cir. 2000).  A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things to be seized.  *United States v. Santarelli*, 778 F.2d 609, 614 (11th Cir. 1985); *Wuagneux*, 683 F.2d at 1349; *United States v. Cook*, 657 F.2d 730, 733 (5th Cir. Unit A Sept. 1981).  A search warrant must indeed be sufficiently precise as not to permit a general search, but the test is the reasonableness of the description.  Elaborate specificity is unnecessary. *See United States v. Strauss*, 678 F.2d 886, 892 (11th Cir. 1982); *United States v. Osborne*, 630 F.2d 374, 378 (5th Cir. 1980).  And, while the Court is mindful of the Supreme Court's often-quoted admonition in *Marron v. United States*, 275 U.S. 192, 196 (1927), that "as to what is to be taken, nothing is left to the discretion of the officer executing the warrant," as the Eleventh Circuit has pointed out, "if this statement were construed as a literal command, no search would be possible."  *Wuagneux*, 683 F.2d at 1349 n.4 (citing *Gurleski v. United States*, 405 F.2d 253 (5th Cir. 1968)).  Instead, the test is whether the search was a general exploration or was specifically directed to the means

15

and instrumentalities by which the crime charged had been committed. *Harris v. United States*, 331 U.S. 145, 153-54 (1947).

Lisbon's argument that the term "identification documents and mail" lacks particularity ignores the fact that the term itself modifies the authorization to search for and seize "[i]ndicia of identity and/or occupancy," [Doc. 203-1 at 3], and was further limited to evidence related to the investigation at hand, i.e., property which constitutes evidence of violations of 21 U.S.C. §§ 841 and 846. [*Id.* at 2]. "A search warrant may be used, not only to gather evidence of a criminal activity, but also to gather evidence of who controlled the premises suspected of connection with criminal acts." *United States v. McLaughlin*, 851 F.2d 283, 286 (9th Cir. 1988). The use of a generic term or a general description (i.e., identification documents and mail) is not *per se* violative of the Fourth Amendment. *Cook*, 657 F.2d at 733. When a more specific description of the items to be seized is unavailable, a general description will suffice, but "[f]ailure to employ the specificity available will invalidate a general description in a warrant." *Id.*

Here, the items sought (identification documents and mail) were tempered by the object of the search - - evidence of identity and/or occupancy of the premises searched - - and in relation to the crimes under investigation. *See Gurleski*, 405 F.2d

16

at 258 (noting that the "search must be one directed in good faith toward the objects specified in the warrant or for other means and instrumentalities by which the crime charged had been committed"). The executing agents were therefore given sufficient direction in executing the warrant and as a result, the warrant did not offend the particularity requirement of the Fourth Amendment.

The Court also rejected Lisbon's next argument, that the executing agents exceeded the scope of the warrant. The search was not made invalid because the executing agents seized, as Lisbon describes, "extensive banking and financial information" from the residence and the Pontiac. "The Fourth Amendment requires that a warrant particularly describe the place to be searched and the terms or person to be seized; exploratory rummaging is prohibited." *United States v. Jenkins*, 901 F.2d 1075, 1081 (11ᵗʰ Cir. 1990). A search may be as extensive as reasonably necessary to locate the items described in the warrant. *Id.* at 1082 (quoting *Wuagneux*, 683 F.2d at 1352). Generally, when law-enforcement officers conduct a search that exceeds the proper scope of a warrant, evidence obtained in that search may be excluded. *United States v. Hendrixson*, 234 F.3d 494, 497 (11ᵗʰ Cir. 2000) (citing *Horton v. California*, 496 U.S. 128, 140 (1990)). However, the seizure of items not covered by a warrant does not automatically invalidate an otherwise valid search.

17

*United States v. Schandl*, 947 F.2d 462, 465 (11th Cir. 1991) (citing *United States v. Henson*, 848 F.2d 1374, 1383 (6th Cir. 1988), where the court held that agents did not exceed the scope of the warrant in a mail-fraud conspiracy case despite the fact that such items as "office supplies, blank paper, horse records, divorce records, and personal income tax records" were seized).   "Only the evidence seized while the police are acting outside of the boundaries of the warrant is subject to suppression." *Hendrixson*, 234 F.3d at 497.   Evidence that is properly within the scope of the warrant will be suppressed only where there has been a "flagrant disregard" of the terms of the warrant. *Wuagneux*, 683 F.2d at 1354.   The crucial inquiry is always "whether the search and seizures were reasonable under all the circumstances."  *Id.* at 1352; *see also United States v. Heldt*, 668 F.2d 1238, 1254 (D.C. Cir. 1981), *cited in Schandl*, 947 F.2d at 465).   Such things as the scope of the warrant, the behavior of the searching agents, the conditions under which the search was conducted, and the nature of the evidence being sought must be considered in determining whether the search was reasonable. *Heldt*, 668 F.2d at 1254.

This aspect of Lisbon's motion should be denied for three reasons.   First, Lisbon has not specifically pointed out which items he contends were seized in violation of the warrant.   He only generally complained about the seizure of "extensive banking and

18

financial records."   Without specifically detailing how the warrant's scope was exceeded in execution, Lisbon was not entitled to a hearing nor the relief of suppression.

Second, the government produced to the Court and Lisbon copies of the documents seized.   The Court has reviewed the documents and the overwhelming majority of them clearly fall within the express terms of the warrant.[5]

Third, while Lisbon contended that "extensive banking and financial information" was seized, [Doc. 194 at 13], those records were subject to seizure as "[i]ndicia of identity and/or occupancy." *See United States v. Blakeney*, 942 F.2d 1001, 1027 (6th Cir. 1991) (holding that since specific examples of documents proving ownership or residency were already included, a clause authorizing "indicia of occupancy, residency and/or ownership of the premises" did not violate particularity; such documents would tend to prove facts that would be relevant in establishing the identity of the perpetrators of the robbery).

As a result, Lisbon was not entitled to an evidentiary hearing on the issuance and execution of the search warrant at 1899 Trotti Street.   Therefore, having rejected

---

[5]      These documents will be filed under seal along with this R&R for purposes of review.

19

Lisbon's other arguments as to the search, the undersigned **RECOMMENDS** that Lisbon's motions directed at suppressing the fruits of the search at 1899 Trotti Street be **DENIED**.

> **B.    335 West Ponce de Leon Avenue, Unit 210, Decatur, Georgia (No. 1:10-MJ-784-LTW, issued June 11, 2010) [Doc. 203-2].**

Lisbon also was not entitled to an evidentiary hearing as to the search by warrant of W. Ponce.  He argued that probable cause was lacking for the issuance of the warrant since there was no nexus between that location and any criminal activity.  [Doc. 194 at 19-20].

The affidavit in support of the warrant related that David G. Noe, the affiant, was a DEA Task Force Agent, with over 20 years experience in investigating violations of the narcotics laws.  He also had extensive training in the investigation of drug trafficking and drug organizations.  [Doc. 203-2 at 2-4].  Based on his training and experience, Noe testified in the affidavit that

> . . .
>
> (c)    Drug traffickers must maintain and have quick access to large amounts of United States currency or other liquid assets in order to maintain and finance their ongoing drug business.
>
> (d)    Drug traffickers often maintain in their residences and/or business establishments computerized or written books, records, receipts, diaries,

notes, ledgers, airline tickets, cashier's checks, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed.

(e)     Drug traffickers commonly conceal contraband, proceeds of drug transactions, records of these transactions, and records reflecting names, nicknames, addresses and telephone numbers of drug associates within their residence and/or places of business, their business vehicles, or the curtilage of their residences or businesses for ready access and to hide them from law enforcement agencies.

(f)     Drug traffickers commonly maintain records at their residences and/or places of business reflecting names, nicknames, addresses and telephone numbers of their current and past drug associates; based on my training and experience, it is common for drug traffickers who provide controlled substances for distribution on a consignment sale basis to create records or ledgers in order to assist them in the collection of drug debts. . . .   Based on my experience, drug traffickers also use cellular telephones, pagers, Blackberry's and similar electronic devices to retain information, including contact names and phone numbers of other drug traffickers and customers.

. . .

(h)     Drug traffickers will commonly conceal within their vehicles, residence or businesses, or within the curtilage of their residence or businesses, caches of drugs, large amount of currency, firearms, financial instruments, precious metals, precious gemstones, jewelry, electronic equipment, and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money made in drug trafficking activities.

[Doc. 203-2 at 9-11].

21

Noe also recounted in the affidavit how law enforcement had been investigating a Mexico-based drug trafficking organization with distribution cells in Atlanta and elsewhere. Jose Trinidad Ayala-Baez, a/k/a Trino, was one of the cell's leaders in Atlanta, who in turn took directions from "Burra" in Mexico. Investigation of the organization had led to the discovery of 33 kilograms of cocaine and over $1.5 million on January 13, 2010, and 15 kilograms of cocaine on January 29, 2010. [*Id.* at 14]. In September 2009, agents intercepted telephone calls detailing the organization's turning over a vehicle with a secret compartment to one of its customers. Surveillance showed Trino and others arriving at an address and then "Tin," one of Trino's workers, delivering a pickup truck (registered to Lisbon at 713McKoy Street, Decatur, Georgia) to 1827 Lomita Road, S.E., Atlanta, Georgia. A pole camera at that location showed a significant amount of short-term visitors at that location, and on June 4, 2010, agents stopped a car that had just driven away from that residence. The driver, who was found to be in possession of a small amount of cocaine, stated that she purchased small amounts of cocaine from a tall black male at that location 4 to 5 times a month. [*Id.* at 14-17].

The affidavit also related that Trino was intercepted on a telephone call on May 21, 2010, being instructed by Burra to deliver 10 kilograms of cocaine to

22

"Bebe." [*Id.* at 23]. Following Trino's arrest on June 9, 2010, he cooperated and identified Bebe as a black male customer to whom, on Burra's instructions, Trino delivered cocaine. Trino also picked up drug money from Bebe. Trino identified Lisbon's photograph in a photographic lineup as "Bebe." Trino stated that the pickup truck with the hidden compartment was delivered to Lisbon at the Lomita residence. Trino also stated he picked up drug proceeds from Lisbon at Trotti within the past couple of weeks. He further admitted to delivering to Lisbon approximately 50 kilograms of cocaine during the preceding 10 months, and picking up drug money directly from Lisbon on three occasions and sending Tin on other occasions. He stated that Lisbon drove a brown, late-model Chevrolet Impala. [*Id.* at 24-25]. An agent observed a gold Chevrolet Impala parked adjacent to Trotti and determined that the vehicle was registered to Trotti Used Cars at that address. [*Id.* at 26].

Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location. *See United States v. Gonzalez*, 940 F.2d 1413, 1419 (11th Cir. 1991). "[P]robable cause is a fluid concept - - turning on the assessment of probabilities in particular factual contexts[.]" *Illinois v. Gates*, 462 U.S. 213, 232 (1983). The task of the issuing magistrate judge in determining whether to issue a

warrant "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.*; *United States v. Jiminez*, 242 F.3d 1243, 1248 (11th Cir. 2000). The issuing magistrate judge may credit statements of a declarant containing admission of criminal conduct. *United States v. Harris*, 403 U.S. 573, 583-84 (1971) ("Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility - - sufficient at least to support a finding of probable cause to search. That the informant may be paid or promised a 'break' does not eliminate the residual risk and opprobrium of having admitted criminal conduct. Concededly admissions of crime do not always lend credibility to contemporaneous or later accusations of another. But here the informant's admission that over a long period and currently he had been buying illicit liquor on certain premises, itself and without more, implicated that property and furnished probable cause to search.").

Then, the task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate judge's decision to issue the warrant. *Massachusetts*

24

*v. Upton,* 466 U.S. 727, 728 (1984). Reviewing courts must not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations. *Gates*, 462 U.S. at 236-37 (citing *United States v. Ventresca*, 380 U.S. 102, 109 (1965)). "[P]robable cause must exist when the magistrate judge issues the search warrant," *United States v. Santa*, 236 F.3d 662, 672 (11th Cir. 2000) (quoting *United States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994)), because a search is not to be made legal by what it turns up, *United States v. Di Re,* 332 U.S. 581, 595 (1948).

An affidavit in support of a search warrant for a suspect's residence "should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002). Thus, where a warrant to search a residence is sought, the affidavit must supply the authorizing magistrate judge with a reasonable basis for concluding that Defendant might keep evidence of his crimes at his home, i.e., a "safe yet accessible place." *United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009) (quoting *United States v. Feliz*, 182 F.3d 82, 87-88 (1st Cir. 1999)).

AO 72A
(Rev.8/8
2)

"[T]he nexus between the objects to be seized and the premises searched can be established from the particular circumstances involved and need not rest on direct observation."   *United States v. Lockett*, 674 F.2d 843, 846 (11th Cir. 1982). With regard to a suspect's home, the *Kapordelis* Court reiterated that:

> "[t]he justification for allowing a search of a person's residence when that person is suspected of criminal activity is the common-sense realization that one tends to conceal fruits and instrumentalities of a crime in a place to which easy access may be had and in which privacy is nevertheless maintained.  In normal situations, few places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime."

*Kapordelis*, 569 F.3d at 1310 (quoting *United States v. Green*, 634 F.2d 222, 226 (5th Cir. Unit B Jan. 1981)).  The *Kapordelis* Court continued:

> There need not be an allegation that the illegal activity occurred at the location to be searched, for example the home, but "the affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity."  [ ] *Martin*, 297 F.3d [at] 1314 [ ]; *see United States v. Anton*, 546 F.3d 1355, 1358 (11th Cir. 2008) (evidence of possession of contraband of type normally expected to be hidden in residence will support search); *United States v. Jenkins*, 901 F.2d 1075, 1080-81 (11th Cir. 1990) (nexus between items to be seized and defendant's home can be established circumstantially where contraband is capable of being hidden in residence).  *But see Green*, 634 F.2d at 226 (convenience of defendant's residence "for use as a place to plan and hide fruits of the crime [was] thus diminished, if not eliminated" where alleged obstruction of justice, suborning of perjury, and violations of citizen's civil rights took place

26

thousands of miles from home in absence of other evidence linking residence and the criminal activity).

569 F.3d at 1310.

In this case, probable cause supported the issuing magistrate judge's conclusion that there was sufficient reason to believe that evidence of Lisbon's drug trafficking would be found at W. Ponce.  The affidavit clearly established that Lisbon had committed violations of 21 U.S.C. §§ 841 and 846.  The affidavit further demonstrated that the W. Ponce apartment was one of Lisbon's residences.  Noe had extensive experience in investigating drug traffickers and averred that the residence was a likely hiding place for contraband and evidence of Lisbon's crime.  "These combined facts would warrant a person of reasonable caution to believe that a search of [Lisbon's] home would uncover evidence of [drug trafficking]."  *Jenkins*, 901 F.2d at 1081; *see also id.* ("This is not to say that the isolated word of an experienced FBI agent that people hide stolen items in their homes is sufficient to provide probable cause to search a residence.  Nor does probable cause to believe that the defendant has stolen something justify search of a residence.  We hold, however, that the combination of a finding of probable cause that Jenkins committed the theft, the fact that the contraband stolen was composed of items which are capable of being hidden in a residence, and the statement

27

of an agent who had ten years' experience investigating bank robberies provided sufficient probable cause to justify a search of Jenkins' home."); *Anton*, 546 F.3d at 1358 (holding that warrant was supported by probable cause where affidavit recounted that (1) agents observed Anton with firearms at several gun shows; (2) confidential informant indicated that Anton would attend a specific gun show and claimed to be in possession of over 300 firearms; (3) based upon agent's experience, convicted felons and firearms dealers possessing contraband typically store these items on their property; and (4) Anton's trailer was observed at multiple gun shows). Thus, the Court rejects Lisbon's probable-cause challenge.

Lisbon's remaining challenges about the W. Ponce search by warrant are identical to the arguments he made with regard to Trotti; that is, the warrant's description of "identification documents and mail" was in violation of the particularity requirement, and the executing agents exceeded the terms of the warrant when they seized "extensive banking and financial information." These arguments are rejected for the same reasons set forth in relation to the Trotti search.

Because the Court concludes that the Trotti and W. Ponce warrants were validly issued and executed, the Court need not address in detail the parties' arguments about the application of the good-faith exception to the exclusionary rule as set out in *United*

28

*States v. Leon*, 468 U.S. 897, 913 (1984).  In *Leon*, the Supreme Court established a

"good faith" exception to the exclusionary rule to prevent suppression of the items

found pursuant to a search warrant.  Under *Leon*, 468 U.S. at 913, the good-faith

exception to the rule requiring the suppression of evidence for Fourth Amendment

violations keeps evidence from being suppressed when law-enforcement officers obtain

evidence through objective, good-faith reliance on a facially valid warrant that is later

found to lack probable cause.  *See United States v. Gonzalez*,  969 F.2d 999, 1004 n.4

(11th Cir. 1992).  Nevertheless, "it is clear that in some circumstances the officer will

have no reasonable grounds for believing that the warrant was properly issued." *Leon*,

468 U.S. at 922-23.  *Leon*'s good-faith exception does not apply to the following

situations: (1) where the magistrate in issuing a warrant was misled by information in

an affidavit that the affiant knew was false or would have known was false except for

his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned

his judicial role; (3) where the affidavit supporting the warrant is so lacking in indicia

of probable cause as to render official belief in its existence entirely unreasonable; and

(4) where, depending upon the circumstances of the particular case, a warrant is so

facially deficient - - i.e., in failing to particularize the place to be searched or the things

to be seized - - that the executing officers cannot reasonably presume it to be valid.

AO 72A
(Rev.8/8
2)

*United States v. Robinson*, 336 F.3d 1293, 1296 (11th Cir. 2003). Thus, under *Leon*'s third exception, the affidavit must not be a "bare-bones" statement containing nothing more than conclusory allegations. *See Leon*, 468 U.S. at 915; *United States v. Glinton*, 154 F.3d 1245, 1257 (11th Cir. 1998).

The Court does not find that the affidavit was so lacking in probable cause as to render official belief in its existence entirely unreasonable. *Robinson*, 336 F.3d at 1296. The affidavit set forth an extensive drug-smuggling and -distribution network with which Lisbon was associated, and as to whose activities Lisbon utilized both his vehicles and residences. As a result, even if probable cause did not exist to issue the W. Ponce search warrant, the evidence seized should not be excluded from Lisbon's trial on account of the good-faith exception to the exclusionary rule.

Accordingly, the undersigned **RECOMMENDS** that Lisbon's motions to suppress challenging the search warrant for W. Ponce be **DENIED**.

30

**C.**      **Safe deposit boxes: Bank of America Safe Deposit Box #C-128, (No. 1:10-MJ-825-LTW, issued June 15, 2010) [Doc. 203-3]; SunTrust Bank Safe Deposit Box #214 (No. 1:10-MJ-828, issued June 15, 2010) [Doc. 203-4]; Wachovia Bank Safe Deposit Box #089 (No. 1:10-MJ-827, issued June 15, 2010 [Doc. 203-5]**

Lisbon moved to suppress three search warrants for safe-deposit boxes, Bank of America Safe Deposit Box # C-128, located in Conyers, Georgia, [search warrant located in the record at Doc. 203-3]; Wachovia Safe Deposit Box # 089, located in McDonough, Georgia,[6] [Doc. 203-5]; and SunTrust Bank Safe Deposit Box # 214, located in Conyers, Georgia, [Doc. 203-4].   (*See* Amended Motion to Suppress, [Doc. 194]).   The Court initially denied Lisbon an evidentiary hearing on his motions to suppress the results of the searches of those boxes, [Doc. 242 at 27-28], because his contentions that the searches were invalid were premised solely on the fact that these warrants were fruits of the unlawful searches by warrant at Trotti and W. Ponce, [*see* Doc. 194 at 6, 24].   Since the Court rejected Lisbon's challenges as to the sufficiency and execution of those search warrants, it followed that the warrants for the safe-deposit boxes were not invalid as fruits of any prior unlawful search.

------------------------------------------------------------

[6]      An additional Wachovia Bank safe-deposit box, # 208, was also searched, but the box was empty.  [*See* Doc. 203 at 1 n.1].

31

As will be shown below, the evidence presented as to the warrantless search at W. Ponce presented a colorable claim that the three safe-deposit-box search warrants were tainted by the fruits of the warrantless search.  The Court discusses below the propriety of the safe-deposit-box warrants in light of that warrantless search and in light of Lisbon's arguments that these warrants were fruits of unlawful warrantless searches of W. Ponce and an automobile at that address.

II.     ***Searches as to which Lisbon was entitled to an evidentiary hearing***

   A.     **Facts**

As noted in the Court's previous order, Lisbon was entitled to an evidentiary hearing on the warrantless search at W. Ponce at the time of his arrest, including the search of his automobile, which resulted in the seizure of the two cellular telephones in the apartment, Lisbon's wallet in his automobile, and a two sets of keys, one in a pair of pants he put on following his arrest and one in the automobile.  These seizures in turn potentially impacted the searches by warrant of the three safe-deposit boxes.

The evidentiary-hearing record discloses that on Friday, June 11, 2010, DEA Task Force Officer David Noe,[7] along with several other DEA agents and task-force

---

[7]     Noe is a Clayton County Sheriff's Deputy who has been assigned to a DEA Task Force for over 10 years.  He has been in law enforcement over 28 years, with 23 of those in narcotics-related investigations.  T1-6.  He had been an agent in

32

officers,[8] went to the W. Ponce apartment to arrest Lisbon on the federal arrest warrant issued following the indictment in this case. T1-7. At that time, the agents did not have a search warrant either for the premises or any automobiles. T1-24. The complex in which Lisbon lived required an electronic card to access the living-units area and the parking garage. T1-26. It appears that the agents gained entry to the development from the complex management. *Id.*

The agents knocked on the door to Lisbon's apartment and Lisbon answered the door. Noe asked him if he was "Artis Lisbon." Lisbon acknowledged his identity and Noe told him he had an arrest warrant for him. T1-7, 27.[9]

Lisbon's apartment was a one-room flat comprised of a sleeping section, living-room section and kitchen. T1-8. Although internal walls separated the three sections in the unit, the bedroom area was visible from the living room. T1-9.

―――――――――――

federal wiretap investigations since 1997. T1-7.

[8]     The other officers were DEA Special Agent Daniel, Task Force Agent Smith and two other law enforcement officers who were not identified in the record. T1-16.

[9]     The agents were familiar with Lisbon's appearance because they had surveilled him. The agents also had seen booking photographs of him because Lisbon had eight or nine prior arrests. T1-27.

33

At the time of his arrest, Lisbon was dressed in his boxer shorts and asked if he could get dressed.  T1-9, T1-62.  Agents performed a security sweep of the apartment to ensure no one else was present, and then escorted him to the bedroom area so he could get dressed.  T1-9, T1-62.  Lisbon pointed out a shirt, a pair of pants and shoes he wanted to wear, and the agents searched them.  T1-9, T1-62.  A set of keys were located and removed from the pants before giving them to Lisbon to wear.  T1-15, T1-30.

Noe read Lisbon *Miranda* rights from a card and asked Lisbon if he would consent to a search of the apartment.  Lisbon stated that Noe would have to get a warrant.  Noe stated he would.  T1-8.

Before Lisbon was removed from the apartment, Noe asked him for his identification.  T1-9.[10]  Lisbon stated it was in his wallet in the center console of his automobile.  T1-10, T1-30-31, T1-51.  However, Lisbon was not asked if the officers could enter his vehicle to get the wallet.  T1-32.

As the agents escorted Lisbon from the apartment, Lisbon asked if he could take his cell phones, and Noe asked him where they were located.  T1-9, 10.  Lisbon

---

[10]   Noe testified that it was his habit to ask arrestees for identification, because it facilitated filling out the personal information sheet for booking purposes, even though, in this instance, he knew the arrestee.  T1-23, T1-33.

34

responded that they were on the coffee table.  Noe knew that Lisbon would not be able

to take the cell phones to jail.  T1-28.  The agents had observed the cell phones on the

coffee table while sweeping the apartment.  T1-42, T1-48.  Noe seized them.  T10.[11]

No cell phone subscribed to Lisbon had been intercepted during the investigation, but

law enforcement did identify cell phones he was using during the investigation.  T1-35,

T1-36.  For example, Lisbon was intercepted speaking with co-conspirators Keyna and

Burra, who were located in Mexico, when he borrowed a cell phone from someone else.

T1-42.[12]

The agents were in Lisbon's apartment for 10 to 15 minutes before escorting him

out.  T1-15.  They exited through the enclosed, gated parking area below the apartment

units.  Lisbon pointed his head in direction of his vehicle, a gold Malibu, and verbally

indicated to the agents where it was parked.  T1-16, T1-34, T1-50.  Agents had seen

Lisbon in this car some weeks before Lisbon's arrest.  T1-24.  A cooperating defendant

---

[11]     Noe explained that the indictment in Lisbon's case was preceded by a
wiretap investigation that involved almost 50 separate telephones.  T1-13.

[12]     The investigation led agents to believe that the conspirators in Mexico
were directing workers in Atlanta to deliver controlled substances to Lisbon.  The
agents believed that Lisbon was using cell phones to communicate with his sources in
Mexico.  However, most of the telephones the agents believed Lisbon was using were
no longer being used by him by the time they were identified through the agents'
analysis of toll records.  T1-43-44.

35

had described "that car when he had conducted meetings to either pick up money or proceeds of drug sales or turn over drugs to" Lisbon.  T1-18.[13]  Using the keys seized from Lisbon's pants, Agent Daniel unlocked the vehicle and retrieved Lisbon's wallet and another set of keys.  T1-17, T1-41.[14, 15]  The keys included safe-deposit-box keys.  T1-36.[16]

---

[13]     Noe testified that in his experience, he had seized cell phones, telephone records, drug records and logs, contacts, drugs, drug paraphernalia and wrapping material when searching vehicles belonging to persons engaged in the drug trade, and also had found hidden compartments in their vehicles.  T1-22.

[14]     Agents previously had seen the gold Malibu during their investigation, when it was at Trotti, although it was described as an Impala in the Trotti search warrant issued the previous evening at 6:10 p.m. [Doc. 203-1 at 2, 26].  Further, one of the cooperating defendants described Lisbon's vehicle as a gold, late-model sedan, which he called an Impala.  Noe also testified that the vehicle had a dealer drive-out tag registered to Trotti Auto Sales.  T1-18-19, T1-59.  The agents saw the vehicle parked in the designated spot for Unit 210 when they arrived that morning at W. Ponce to arrest Lisbon.  T1-60.

[15]     Noe testified that if he had not had possessed the keys to the Malibu, the agents would have attempted to enter it with a "slim jim."  T2-8.

[16]     Daniel testified that he took the set of keys from the Malibu because he knew they would later be searching the Trotti location and he wanted to use a key to gain entry instead of breaking down the doors.  T1-52.  (The search warrant had been issued on June 10, 2010, at 6:10 pm.  [Doc. 203-1 at 2]).  He did not notice safe-deposit keys on the key ring at the time he seized the keys from the Malibu.  T1-52.

The keys seized from the Malibu contained 15 to 18 keys.  Three safe-deposit-box rings were on their own key ring attached to the larger key ring.  T2-4.  The safe-deposit keys did not indicate the box number, bank, or branch.  T2-4.

36

Noe examined the wallet's contents on Friday, June 11, 2010, at his office after executing the Trotti search warrant. T2-9.[17]  When he opened the wallet to get Lisbon's driver's license, he saw a business card with a bank name and account numbers, as well as bank-account numbers and balances and safe-deposit-box numbers.  T1-37-39; T1-65-66; T2-11; Def. Exhs. 1 at 6-8, 2 at 9.  To Noe, this evidence corroborated the financial-record evidence he found at Trotti[18] and subsequently at W. Ponce.  T2-12.

Noe obtained a search warrant for W. Ponce on the same day as Lisbon's arrest, June 11, 2010, at 12:25 pm.  T1-12, T1-64; Gov't Exh. 1.  The search warrant authorized seizure and search of cell phones.  T1-13.  The W. Ponce warrant was executed that day.  T2-12.  As a result of executing that search warrant, financial

_____

The DEA later seized the vehicle. T1-53.  Prior to obtaining search warrants for safe-deposit boxes, agents called the banks and inquired about the existence of any safe-deposit boxes associated with Lisbon.  T1-68.  Although the agents were aware of most of the safe-deposit boxes prior to calling the banks, the calls resulted in discovery of one box unknown to law enforcement.  T1-69.  The three keys were used to open the three safe-deposit boxes once the warrants were obtained, T1-56, while a locksmith drilled open the fourth box.  T2-5.

[17]     Following the Trotti search, Noe returned to his office and drafted the W. Ponce search warrant.  T2-9.

[18]     The bank-record information seized from Trotti was comprised of the following documents: (1) a Bank of America statement for Trotti Used Car Sales Inc. for April 2010 (Gov't Exh. 5 at unnumbered pages 34-36); and (2) a copy of a SunTrust official check dated March 22, 2010 (*id.* at 53).  *See also* T2-10.

37

records, including documents reflecting a bank record, were seized.  T1-64; T2-12; Gov't Exh. 2.[19]

Noe further searched the wallet on the following Monday.  T1-64; T2-13.  As a result of seeing financial records in executing the search warrants at Trotti and W. Ponce, as well as seeing the papers in the wallet, Noe directed another agent to call the banks the next day.  T2-13, T2-18, T2-23.  However, no documents from Wachovia were located during the searches, and Noe conceded that he directed the call to Wachovia Bank because of the documents found in Lisbon's wallet.  T2-20, T2-21.  Wachovia, SunTrust, and Bank of America told law enforcement which accounts and safe-deposit boxes Lisbon had at their respective banks.  T2-21.  As a result of those calls, the agents learned of two additional accounts of which they were previously unaware.  T2-16.  Then, Noe drafted an affidavit in support of a search warrant for each of the accounts or boxes.  T2-22.  He did not advise the issuing magistrate judge that he learned of the safe-deposit boxes from searching Lisbon's vehicle without a warrant. T2-22.

---

[19]     The bank record seized from W. Ponce was a SunTrust deposit slip.  Gov't Exh. 2 at unnumbered page 4.

38

**B.      Contentions of the parties**

Following the first evidentiary hearing, Lisbon filed his second amended motion to suppress, [Doc. 256],[20] in which he contended that the search warrants for the safe-deposit boxes were the fruits of the illegal warrantless search of his apartment and automobile at the time of his arrest.[21]

_____

[20]      Lisbon argues that his second amended suppression motion was timely filed, or that if not timely should in any event be considered on the merits. [Doc. 256 at 5-7]. He first argues that this motion relates back to his arguments in his initial and amended motions that all fruits of the warrantless search at W. Ponce be suppressed, since the search of the safe deposit boxes resulted from that earlier search. [*Id.* at 7]. Also, he argues that since the Court heard evidence about how items seized from W. Ponce impacted the subsequent search of the safe-deposit boxes and the government argued that the search of the safe-deposit boxes was not tainted, the Court should address the second amended motion on its merits. [*Id.* at 9].

The Court concludes that although Lisbon initially only argued that the safe-deposit box warrants were defective because they were fruits of previously issued search warrants that were not supported by probable cause, [*see* Doc. 194 at 6, 24], the second amended motion is timely. First, it relates back to the initial motions, and the evidence presented at the first evidentiary hearing raised a colorable claim that the seizure of the wallet and keys from Lisbon's residence and automobile were in violation of the Fourth Amendment. Second, the government did not raise a timeliness issue as to this motion. [*See generally* Dkt., Doc. 266]. As a result, the Court will address the merits of the second amended motion.

[21]      In fact, he argued that the application for the search warrants for the safe-deposit boxes did not describe with any detail the warrantless search of Lisbon's residence or automobile as demonstrated by the evidentiary-hearing evidence, but rather stated:

39

In its first post-evidentiary-hearing brief, the government first contends that the cell phones were lawfully seized pursuant to the plain-view doctrine. [Doc. 266 at 11]. It argues that while plain view requires that the probable cause that the object in plain view is contraband or evidence be "immediately apparent," the doctrine does not require an "unduly high degree of certainty as to the incriminatory character of evidence" or that police " 'know' that certain items are contraband or evidence of a crime," (quoting *Texas v. Brown*, 460 U.S. 730, 741 (1983)). [Doc. 266 at 11]. The government points out that courts have held that cell phones in drug-trafficking investigations may come within the plain-view exception "as items akin to contraband, in that they are often tools of . . . drug-trafficking," (quoting *United States v. Santillan*, 571 F. Supp. 2d 1093, 1100-01 (D. Ariz. 2008) (citation omitted)). [Doc. 266 at 13]. It then contends that in this case, the investigation involved intercepting approximately 26 cell phones, which resulted in agents

_____

27. During the search of 1899 Trotti Street and 335 W. Ponce de Leon Ave apt #210, agents located numerous deposit slips, references to bank accounts and safety deposit boxes at Bank of America, Sun Trust and Wachovia Banks. TFO Jeff Shelton made contact with Bank of America, Sun Trust Bank and Wachovia Bank to confirm that Artis Lisbon holds the following accounts and safety deposit boxes.

[Doc. 256 at 10 (quoting Doc. 203-5 at 30].

40

overhearing conversations (corroborated by Trino's post-arrest statements) that Lisbon was receiving drugs from the organization and money was being picked up by the organization from Lisbon.  Thus, consistent with Noe's testimony that drug trafficker's cell phones often contain evidence of co-conspirator contacts and text messages indicating criminal activity, there was probable cause to believe that Lisbon's cell phones contained evidence of criminal activity.  [*Id.* at 14].  The government then contends that because the cell phones were properly seized pursuant to the plain-view doctrine, they did not need to be searched contemporaneously, and in any event no search warrant to search them was needed.  [*Id.* at 15].  Alternatively, the government argues (1) that the subsequent search warrant for the W. Ponce apartment authorized the seizure and search of cell phones, [*id.* at 15 & n.9 (citing Doc. 203-2 at 2)], and (2) the independent-source doctrine justified the search, since the cell phones would have been searched pursuant to the warrant for W. Ponce.  [*Id.* at 15].

Next, the government argues that the search of the Malibu's console was justified under the "automobile exception" to the warrant requirement, since there was probable cause to believe that the vehicle contained evidence of Lisbon's drug trafficking.  [*Id.* at 18].  In addition to intercepted phone calls demonstrating that drugs were being delivered to Lisbon and one intercepted call reflecting that a pickup truck registered to

41

Lisbon contained a secret compartment, agents had seen the gold Malibu at the Trotti location, and Trino had indicated that Lisbon used a gold or light-brown vehicle in his drug-trafficking activities. [*Id.* at 19]. The government submits that this evidence, combined with Noe's testimony that in his experience, drug traffickers' vehicles often contains relevant evidence of their drug crimes, established probable cause to believe that the Malibu contained evidence of Lisbon's drug activities. [*Id.* at 20]. Further, the government posits that the agents' actual intent at the time the Malibu was searched is irrelevant and that law enforcement could seize the wallet and search it at a later time, relying on *United States v. Johns*, 469 U.S. 478 (1985), and *United States v. Weber*, 808 F.2d 1422 (11th Cir. 1987). [Doc. 266 at 22].

Next, the government argues that the same legal principles governed the seizure of the keys from the Malibu. In this regard, the government contends that there was probable cause to seize the keys because they established Lisbon's connection to Trotti. [*Id.* at 23-24].

The government further argues that the facts indicated that Lisbon impliedly consented to the search of the center console of the Malibu when he told Noe where his wallet was and pointed his head in the direction of the car. [*Id.* at 24-29].

42

Next, the government contends that the searches of the cell phones, wallet, and keys were lawful under the independent-source doctrine. [*Id.* at 29]. It argues that the same items would have been discovered, seized, and searched once the W. Ponce search warrant was obtained a few hours after Lisbon's arrest. [*Id.* at 29-31].

Finally, the government argues that the safe-deposit-box search warrants were not tainted by the seizure of the cell phones and warrantless search of the Malibu. It argues that the cell phones and keys were not mentioned in the safe-deposit-box warrant applications. [*Id.* at 32]. The government asks that the evidentiary record be re-opened to allow it to show that the discovery of financial records at Trotti and W. Ponce would have resulted in the calling of the banks and discovery of the existence of the safe-deposit boxes.[22] [*Id.* at 33-35].

In response after the first evidentiary hearing, Lisbon first argues that Noe's testimony about how the cell phones were seized was inherently incredible. Lisbon acknowledges that the agents were legitimately on the premises, given their arrest warrant for Lisbon and Lisbon's state of undress, requiring entry into the apartment to

---

[22]     The government pointed out that seizure warrants were executed on various bank accounts at the same time the safe-deposit-box warrants were executed, resulting in the seizure of approximately $220,000 from seven accounts associated with Lisbon.     A civil forfeiture action concerning those funds is pending but stayed. [Doc. 266 at 33 n.13].

43

get clothes.  Nonetheless, he contends that Noe's testimony was unworthy of belief because (1) it is highly unlikely that the agents, in conducting a protective sweep of the apartment, did not see the cell phones, and (2) since Noe said they were in plain view, it was unlikely that he had to ask Lisbon where the cell phones were located when Lisbon asked if he could take them as he was being escorted to jail.  Similarly, Lisbon argues that since he had been to jail many times before and had to know that cell phones were contraband in jail, Noe's testimony that Lisbon asked to take his cell phones to jail should be ignored as incredible.  Further, Lisbon argues that Noe's testimony about the seizure of the cell phones in this case was inconsistent with the seizure of cell phones in another case, *United States v. Rodriguez-Alehjandro*, 664 F. Supp. 2d 1320, 1332-33 (N.D. Ga. 2009), where Noe also was involved and where the evidence was that during a protective sweep of the defendant's apartment, the sweeping agents called out the discovery of the presence of cell phones as they went through the apartment.  [Doc. 271 at 9-12].  In the present case, Lisbon argued, "it is highly dubious at best that trained DEA agents would have noticed cell phones during a protective sweep in a drug investigation and then 'forgotten' about them until allegedly 'reminded' by the defendant as they were leaving the premises."  [*Id.* at 12].

44

He next argues that the cell phones could not be seized without a warrant because their incriminating nature was not immediately apparent, since Agent Daniel acknowledged that they were not unlawful or contraband *per se*. [*Id.* (citing T1-59)]. He also attempted to distinguish the cases relied upon by the government, which posit that cell phones are tools of the drug trade. [*Id.* at 14]. In further support of his argument, Lisbon cited to *United States v. Lall*, 607 F.3d 1277, 1292 (11th Cir. 2010), where the Court found improper the warrantless seizure of equipment used by the defendant in furtherance of his fraud/identity-theft crimes because the officer testified that the criminal characteristics of the equipment were not immediately apparent to him at the time of the seizure, and *United States v. Sokolow*, 450 F.2d 324 (5th Cir. 1971), where the Court found that in an interstate theft case, air conditioners possessed by the defendant gave no indication that they were contraband or evidence of a crime. [Doc. 271 at 13-14].

Next, Lisbon argues that there was no probable cause to enter the Malibu without a warrant. [Doc. 271 at 15]. He contends that there was no probable cause because all the agents knew that Lisbon's wallet and driver's license were in the car, items which were neither contraband nor "tools" of the drug trade, and the agents were unaware that the wallet contained any incriminating evidence. [*Id.* at 15-16]. He points out that the

45

government only alleged that the vehicle was seen at Trotti and that a co-defendant stated that Lisbon drove a gold or light-brown sedan, facts he alleges do not establish probable cause. [*Id.* at 16].

Lisbon also argues that no exigent circumstances existed to search the vehicle without a warrant because the Malibu was in a controlled-access garage accessible only by a key card, Lisbon was going to jail, and there was no one associated with Lisbon in the area. [*Id.* at 16-17].

Next, Lisbon argues that he did not impliedly consent to a search of the vehicle simply by not voicing any objection while the arresting agents entered the Malibu. [*Id.* at 19-22]. He also contends that any implied consent to search the vehicle for his wallet did not extend to the search for and seizure of his keys in the center console. [*Id.* at 22].

He also challenges the government's contention that the safe-deposit-box warrants are saved due to the independent-source doctrine, arguing that the doctrine does not apply where agents are motivated by the discovery that safe-deposit-box keys were on set of keys found in the Malibu. [*Id.* at 24-25]. He also claims that the doctrine was inapplicable since the warrant application omitted how the wallet and keys

46

were seized from the vehicle. [*Id.* at 25]. However, he agrees that the government could re-open the evidence to attempt to establish a lack of taint. [*Id.*].

Following the second evidentiary hearing, Lisbon notes that the affidavits in support of the search warrants for the safe-deposit-boxes identically provided as follows:

> 27.     During the search of 1899 Trotti Street, and 335 W. Ponce De Leon Ave apt #120, agents located numerous deposit slips, references to bank accounts and safety deposit boxes at Bank of America, Sun Trust Bank and Wachovia Banks.    TFO Jeff Shelton made contact with Bank of America, Sun Trust Bank and Wachovia Bank to confirm that Artis Lisbon holds the following accounts and safety deposit boxes.

[Doc. 292 at 4 (quoting Doc. 203-3 at 31, 203-4 at 31, and 203-5 at 31)]. He then argues that the items seized from these boxes must be suppressed because when the evidence illegally seized from his vehicle is excluded from the affidavits, probable cause was lacking to issue the warrants. [*Id.*].

In this regard, he first argues that the bank records seized by search warrant from Trotti and W. Ponce did not have his name on them, nor did they reference safe-deposit boxes or even mention Wachovia Bank. [*Id.* at 6]. Second, Lisbon claims that the search of the Malibu was unlawful and thus the evidence seized unlawfully from it - - the safe deposit box keys and his wallet - - cannot be used to establish probable

47

cause to search the safe-deposit boxes and bank accounts.  [*Id.* at 6-7].  He also claims that Noe's testimony - - that he had the banks called solely as a result of finding bank records (which did not have Lisbon's name on them) during the Trotti and W. Ponce searches - - is incredible.  [*Id.* at 7].  He further argues that nothing occurred between the seizure of his keys and wallet and the application for the seizure and search warrants directed at the banks in order to remove any taint from the unlawful warrantless search.  [*Id.* at 7-8].

Lisbon next contends that the affidavits in support of the safe-deposit and seizure warrants contain material omissions made with an intent to mislead or at a minimum with reckless disregard for the truth, pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).  He contends that the affidavits omitted or misstated the following facts:

1. Omission of any reference to the agents' seizure of his car keys and cellular telephones in his condominium at the time of his arrest;

2. Omission of any reference to the warrantless search of his vehicle parked at the condominium at the time of his arrest;

3. Omission of any reference to the seizure of his key ring and wallet from the vehicle;

4. Omission of any reference that the agents had seized the actual keys to the safe-deposit boxes;

48

5.     Omission of any reference to Noe's finding the bank account and safe deposit box information in Lisbon's wallet on June 11, 2010; and

6.     A false statement that agents located deposits slips or references to bank accounts or safe-deposit boxes at Wachovia Bank.

[Doc. 292 at 9].  He then contends that Noe intentionally omitted or misstated this information because Noe testified that he only presented in the affidavits the information that he "needed to."  [*Id.* at 10 (quoting T2-22)].  Primarily relying upon *United States v. Tate*, 524 F.3d 449 (4th Cir. 2008), Lisbon argues that since the affidavits for the safe-deposit boxes and bank accounts in this case omitted any reference to the search of the Malibu and seizure of his wallet, keys, and financial information, which discussion was material to the finding of probable cause, the warrants were improperly issued.  [Doc. 292 at 10-13].

In response, the government argues that the Malibu was properly searched pursuant to the automobile exception to the warrant requirement because there was probable cause and the vehicle was operational.  [Doc. 293 at 1-2].  It also argues that as to probable cause, Lisbon ignored the evidence that (1) a cooperating codefendant described the vehicle's use in Lisbon's drug trafficking, and (2) Noe testified that, in

49

his experience, searching drug traffickers' vehicles resulted in the seizure of evidence relevant to their crimes.  [*Id.* at 2].

Next, the government responds that although the subjective intent of the seizing officers is not at issue, their experience as it relates to what a reasonably prudent officer would do in a similar situation is relevant, and thus the Court can consider the officers' reasonable beliefs as to whether there was probable cause to seize the two sets of keys.  [*Id.*].  The government further argues that, in any event, the keys (and the automobile containing the wallet) would have been searched and seized following the execution of the search warrant later on that date.  [*Id.* at 3 n.1].  It also argues that Lisbon did not address, and therefore has not countered, the government's earlier argument that once probable cause existed as to the Malibu, law enforcement could seize any containers (including the wallet) from the vehicle and search them at a later time pursuant to *Johns*.  [*Id.* at 3].  It alternatively argues that the search of the Malibu and seizure of the wallet were based on consent.  [*Id.* at 3 n.2].

Further, the government argues that the uncontradicted evidence establishes that Lisbon asked for his cell phones and that regardless whether Noe saw them previously, their seizure was permissible under the plain-view doctrine.  [*Id.* at 3-4].  It further

50

notes that Lisbon did not challenge the search of the cell phones on the grounds that a warrant was needed.  [*Id.* at 4 n.3].

As to the safe-deposit boxes, the government first argues that Lisbon's attempt in his final brief to raise a *Franks* claim should be rejected, but that in any event he has failed to satisfy his *Franks* burden.  [*Id.* at 4-6].  Specifically, the government argues that Noe believed the keys and wallet were properly seized and that he included in the affidavits for the bank search warrants only that information that he believed he "needed to" assert in order to demonstrate probable cause, and thus there was neither intent to deceive nor reckless disregard for the truth.  [*Id.* at 6-7].  It also contends that any omissions were not material, since what was seized from the apartment at the time of Lisbon's arrest was irrelevant, and the safe-deposit box keys seized from the Malibu did not identify any particular bank, branch, or box number.  [*Id.* at 7].  It further submits that Lisbon did not show which facts from the seizure of the wallet the affiant should have included in the warrant application, and the fact that the wallet was seized without a warrant would not have detracted from the showing of probable cause.  [*Id.*].  The government also argues that whether the warrantless seizure of the wallet was proper is not a *Franks* issue at all; rather, if it was illegally seized, the Court must undertake a taint analysis. [*Id.* at 7-8].  The government also distinguishes *Tate* on the

51

grounds that there, the defendant made a substantial showing that the affiant misled the judge relating to the only source of critical information contained in the warrant application. [*Id.* at 9-10].

Finally, the government argues that other than the warrants for Wachovia Bank - - since the warranted searches at Trotti and W. Ponce had uncovered financial records, leading Noe to direct his fellow agents to make inquiry of the banks - - the warrants for Bank of America and SunTrust did not exploit any unlawful search and sufficiently attenuated any taint from it. [*Id.* at 10-11]. Also, the government perfunctorily re-asserts its contention that the searches were saved by the independent-source doctrine and the good-faith exception. [*Id.* at 11].

## C.    Discussion

The government searched for and seized five items without a warrant: (1) Lisbon's keys located in his pants that he wanted to wear following his arrest; (2) the cell phones; (3) the Malibu; (4) the set of keys in the Malibu; and (5) Lisbon's wallet in the Malibu.  The Court will address the validity of each search and/or seizure in the order in which they were obtained by law enforcement.

The Fourth Amendment to the United States Constitution protects the right of persons to be free from unreasonable searches and seizures.  U.S. Const. Amend. IV.

52

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York,* 445 U.S. 573, 586 (1980); *United States v. Santa*, 236 F.3d 662, 668 (11th Cir. 2000). Upon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution. *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983) (citing *United States v. Impson,* 482 F.2d 197 (5th Cir. 1973)).   Thus, the government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the Fourth Amendment.  *Vale v. Louisiana*, 399 U.S. 30, 34 (1969); *United States v. Jeffers*, 342 U.S. 48, 51 (1951); *Freire*, *supra*.

1.     *Keys in Lisbon's pants*

The government has not articulated a theory as to which exception to the warrant requirement is applicable to the keys removed from the pants that Lisbon wanted to wear following his arrest.  However, "[a]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify the action.' "  *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)).

53

Viewed objectively, the Court concludes that the keys were lawfully seized as a search incident to lawful arrest.

In *United States v. Ricks*, 817 F.2d 692 (11th Cir. 1987), the defendant, after a lawful arrest, was asked whether he wanted to put on a jacket. *Id.* at 694. When the defendant answered affirmatively, the arresting agents searched the jacket and found a number of pieces of paper with the names, telephone numbers, and addresses of two men indicted as co-defendants. *Id.* at 694-95. Citing to the "grab area" holding of *Chimel v. California*, 395 U.S. 752, 763 (1969), the *Ricks* Court held that the jacket became subject to a legitimate search when the agent handed it to the defendant, thus placing it within his "grab area." *Ricks*, 817 F.2d at 696. Based on this conclusion, the court concluded that the search of the jacket was a search incident to a lawful arrest. *Id.*

The reasoning of the *Ricks* decision is fully applicable to the fact of this case. After he was lawfully arrested, Lisbon asked if he could get dressed and selected for the agents the pants he wanted to wear. As such, his pants were legitimately searched as incident to his lawful arrest because once he was given them to put on, they would be in his "grab area." *See United States v. Salgado*, Criminal Action No. 1:09-CR-454-CAP-ECS-5, 2010 WL 3062440, at *2 (N.D. Ga. June 12, 2010)

54

(Scofield, M.J.) (R&R) (concluding that *Ricks* authorized search incident to arrest where pants were searched prior to arrested defendant putting them on), *adopted by* 2010 WL 3035755 (N.D. Ga. July 30, 2010) (Pannell, J.).

Alternatively, even if the keys to the Malibu were not properly seized incident to Lisbon's arrest, as discussed below the officers had probable cause to search the Malibu regardless whether they possessed the car keys to gain entry.

### 2.    *Cell phones*

The Court concludes that the cell phones were properly seized pursuant to the plain-view doctrine.[23] The plain-view doctrine permits a warrantless seizure where the officer is lawfully located in the place from which the seized object could be plainly viewed and has a lawful right of access to the object itself.  *United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006). The officer may seize any item that he has probable cause to believe is contraband and any item whose incriminating nature is immediately apparent.   *United States v. Ochoa*, 402 Fed. Appx. 478, 484 (11th Cir. Nov. 9, 2010) (citing *Smith*, *id.*); *see also Texas v. Brown*, 460 U.S. 730,

---

[23]    The government did not argue that Lisbon's request for his cell phones makes their seizure similar to the seizure of the keys from Lisbon's pants pocket.  As a result, the Court does not discuss whether such an argument would be valid except to note that since Noe was not going to let Lisbon have the cell phones, they were not going to be within Lisbon's "grab area."

AO 72A
(Rev.8/8
2)

741-42 (1983) (reconsidering the "immediately apparent" language in *Coolidge v. New Hampshire*, 403 U.S. 443 (1971), and substituting a less-rigorous probable-cause standard for plain-view seizures). Probable cause to seize an item in plain view exists whenever the facts available to the searching officer support a reasonable belief that the item may be contraband, stolen property, or evidence of a crime. *Brown*, 460 U.S. at 742. The plain-view doctrine, however, cannot be used to justify exploratory or investigative searches until "something incriminating at last emerges." *Coolidge*, 403 U.S. at 446.

As previously noted, probable-cause issues are to be decided on an objective basis by courts without regard to the subjective beliefs of law-enforcement officers, whatever those beliefs may have been. *See, e.g., Whren v. United States*, 517 U.S. 806, 813-14 (1996) ("Subjective intentions play no role in ordinary, probable-cause, Fourth Amendment analysis."); *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (probable cause is based upon evaluation of the "facts, viewed from the standpoint of an objectively reasonable police officer"); *United States v. Roy*, 869 F.2d 1427, 1433 (11th Cir. 1989) (rejecting notion that probable cause turns on what law-enforcement officers think, and holding that "[c]ourts determine the existence of probable cause"); *see also Horton v. California*, 496 U.S. 128, 138 (1990) ("[E]venhanded law

56

enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer.").

The propriety of seizures under the plain-view doctrine are adjudicated on an objective basis.  *See Horton*, 496 U.S. at 138 (rejecting argument that "plain view" seizure requires inadvertent discovery in part because of preference for "application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer"); *cf. Scott v. United States*, 436 U.S. 128, 138 (1978) (stating that "fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action"); *United States v. Hromada*, 49 F.3d 685, 691 (11th Cir. 1995) ("Just because the police officers were glad that they could capitalize on the opportunity by incidentally seeing what was in plain view is of no moment.  Whether or not a Fourth Amendment violation has occurred depends upon objective reasonableness in light of the facts and circumstances.") (citing *Scott*, 436 U.S. at 136).[24]

---

[24]     *See also United States v. Stafford*, 416 F.3d 1068, 1076 (9th Cir. 2005) ("The determination of whether the officers had probable cause to believe that the items seized were illegal, unlawful, or associated with criminal activity is objective, but we apply it to the 'actual and/or perceived belief of the law enforcement officer as he . . . engages in search and seizure.' . . .  This standard does not require the officers

In the present case, whether the officers observed the cell phones during the protective sweep is irrelevant.[25]  Rather, what is relevant is that the cell phones were in plain view and that, objectively, there was probable cause for their seizure.  First, the evidence is uncontradicted that Lisbon directed the officers to the cell phones, which were sitting out in the open on a table.

Second, the Eleventh Circuit and numerous other federal appellate courts recognize that cell phones are "a known tool of the drug trade." *United States v. Nixon*, 918 F.2d 895, 900 (11th Cir. 1990); *see also United States v. Lazcano-Villalobos*,

_____

to know that the item seized is illegal.") (citations omitted); *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 554 (6th Cir. 2003) ("Assuming that the officers were executing a valid warrant and thus were legally in a place where they saw the jewelry and documents in plain view, the seizure of these items during the execution of the first warrant was nevertheless unconstitutional because their incriminating character is not immediately apparent as an objective matter."); *United States v. Reed*, 726 F.2d 339, 343 (7th Cir. 1984) ("Executing officers, however, need not know that items in plain view were stolen before they may act on the items' immediately apparent incriminating nature; a reasonable belief, using the probable cause formulation, is sufficient in the ordinary case.") (citing, *inter alia*, *Texas v. Brown*, 460 U.S. 730 (1983)); *United States v. Messino*, 871 F. Supp. 1035, 1039 (N.D. Ill. 1995) ("The court finds no controlling precedent as to the objectivity of the immediate apparency requirement itself, but controlling cases discussing the objectivity of the Fourth Amendment reasonableness inquiry in general are read naturally to apply to this particular aspect of Fourth Amendment jurisprudence.").

[25]    The Court therefore rejects Lisbon's arguments that Noe's testimony about how the cell phones were seized were not credible.  However, the Court notes that how officers acted in another case generally is not probative of how they acted in this case.

175 F.3d 838, 844 (10th Cir. 1999) ("[C]ellular telephones are recognized tools of the drug-dealing trade."); *United States v. Sasson*, 62 F.3d 874, 886 (7th Cir. 1995) (describing possession of cell phones, among several other objects, as one of "the usual 'trappings' of a person involved in the drug trade"); *United States v. De La Cruz*, 996 F.2d 1307, 1311 (1st Cir. 1993) (labeling cell phones and beepers as "well known tools of the drug trade"). The Court finds these cases more persuasive than the cases cited by Lisbon, particularly where, as here, the drug conspirators were shown to utilize cell phones to communicate with one another.

Also, objectively, it was immediately apparent that there was probable cause that the cell phones contained evidence of the crimes for which Lisbon had been indicted. The officers knew that the drug-trafficking organization with which Lisbon was associated used cell phones to communicate with one another as to deliveries of controlled substances, pick-up of drug proceeds, and distribution to customers. [*See, e.g.*, Doc. 203-1 at 15 (describing Title III intercepts disclosing delivery of pick-up truck registered to Lisbon with hidden compartment); *id.* at 18 (describing Title III intercepts disclosing delivery of suspected contraband); *id.* at 18-19 and 20-23 (describing Title III intercept disclosing pick-up and seizure of drug proceeds); T1-42 (describing that Lisbon was intercepted speaking with co-conspirators Keyna and

59

Burra, who were located in Mexico, when he borrowed a cell phone from another person); T1-43-44 (describing agents' belief that Lisbon was using cell phones to communicate with his sources in Mexico but noting that most of the telephones the agents believed Lisbon was using were no longer being used by him by the time they were identified through the agents' analysis of toll records). Thus, law enforcement reasonably believed that Lisbon was using cell phones to communicate with his suppliers in Mexico, as well as those who were delivering drugs to, and picking up proceeds from, him. As a result, the cell phones were properly seized.[26]

> 3. *Search of the Malibu*

As noted, the government contends that the warrantless search of the Malibu was justified by two exceptions to the warrant requirement: consent and the automobile exception. The Court addresses them in turn.

> i. *Consent*

A search conducted pursuant to consent is a recognized exception to the requirements of probable cause and a search warrant. *United States v. Harris*, 928 F.2d 1113, 1117 (11th Cir. 1991) (citing *United States v. Baldwin*, 644 F.2d 381,

---

[26] Lisbon did not make an independent argument that the cell phones subsequently were searched without a warrant. Therefore, the Court does not address any such contention.

AO 72A
(Rev.8/8
2)

383 (5th Cir. 1981)); *see also Katz v. United States*, 389 U.S. 347, 357 (1967) (recognizing warrantless search made pursuant to consent as one of the "specifically established and well-delineated" exceptions to the warrant requirement). When the consent exception is invoked, "the government bears the burden of proving the existence and voluntariness of the consent." *United States v. Emanuel*, No. 10–14764, 2011 WL 4376191, at *2 (11th Cir. Sept. 21, 2011) (citing *United States v. Acosta*, 363 F.3d 1141, 1151 (11th Cir. 2004)). Courts look to several factors to determine whether a defendant's consent to search was voluntary, "including the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found." *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001). Voluntariness of consent depends on the totality of the circumstances. *Id.* "Consent to conduct a search is voluntary if it is the product of an 'essentially free and unconstrained choice.' " *United States v. Figueroa*, 419 Fed. Appx. 973, 977 (11th Cir. Mar. 31, 2011) (quoting *Purcell*, 236 F.3d at 1281). "While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent." *Purcell*, 236 F.3d at 1281–82 (internal

61

quotation marks omitted).  Also, without other evidence of coercion, that a defendant is handcuffed does not make the consent involuntary.  *See United States v. Garcia*, 890 F.2d 355, 362 (11th Cir. 1989) (finding consent voluntarily given even though fourteen law enforcement agents were present when the defendant was arrested and the defendant was handcuffed at the time he gave consent); *see also United States v. Villanueva-Fabela*, 202 Fed. Appx. 421, 427 (11th Cir. Oct. 27, 2006) ("Moreover, although Villanueva-Fabela was placed in handcuffs, this factor alone does not make the consent involuntary.").

Further, if the arrest was lawful, the government must still establish "the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily." *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989).  An individual may provide implied consent where "the defendant's body language indicated his assent to the search." *United States v. Chrispin*, 181 Fed. Appx. 935, 939 (11th Cir. May 26, 2006) (citing *United States v. Ramirez-Chilel*, 289 F.3d 744, 752 (11th Cir. 2002)).[27]

---

[27]    It is significant that the search complained of here is of an automobile and not a home.  As the Eleventh Circuit has noted,

> In the context of warrantless searches of a home, we have concluded that meaningful consent cannot be derived from the mere failure to object to

The Court concludes that under the unique circumstances of this case, Lisbon did not voluntarily consent to a search of his vehicle but rather acquiesced to a show of lawful authority.  Several factors underlie the Court's conclusion.  First, and foremost, he denied consent to the search of his apartment when he was asked whether he would consent to search.  As to the vehicle, Noe did not ask Lisbon if he could search it, nor did he ask permission to obtain the wallet from the vehicle.  T1-32.  Instead, while the officers had lawfully seized the keys to the Malibu and used the keys to open the Malibu, their stated purpose in entering the Malibu was to obtain Lisbon's identification, not to search the vehicle.

Second, other than for Noe's convenience, there was no legal basis for requesting Lisbon's identification, since the officers knew exactly who he was, and Noe did not give Lisbon any reason for asking for identification.  As a result, the Court concludes that Lisbon merely acquiesced to a show of lawful authority in pointing out his vehicle.

---

a search, and that "whatever relevance the implied consent doctrine may have in other contexts, it is inappropriate to 'sanction[ ] entry into the home based upon inferred consent.' " [*United States v.*] *Gonzalez,* [71 F.3d 819, 829 (11th Cir. 1996)] (quoting *United States v. Shaibu,* 920 F.2d 1423, 1426 (9th Cir. 1990)).

*Shepard v. Davis*, 300 Fed. Appx. 832, 841 (11th Cir. Nov. 25, 2008).

63

The government did not prove that Lisbon knowingly and voluntarily consented to a search of his car.[28]

### ii.    Automobile exception

In *Carroll v. United States*, 267 U.S. 132, 153 (1925), the Supreme Court established an exception to the warrant requirement for searches of automobiles and other moving vehicles.  Under the so-called "automobile exception,"[29] "[i]f a car is

_____

[28]    The Court therefore finds the present case different from others where implied consent to search was found.  For example, in *Diehl v. Munro*, 170 F. Supp. 2d 311, 320 (N.D.N.Y. 2001), the court observed,

> Here, the evidence is undisputed that Diehl both requested the defendants to retrieve his pants and shoes from the rear of the van and instructed Munro how to open the side door.  Such words and conduct reasonably constituted consent by Diehl for Munro to enter the rear of the van.  Moreover, because the request for the pants and shoes was generated by Diehl, because Diehl's prior conduct evidenced his knowledge and ability to refuse consent to the police and from the totality of the circumstances, the defendants have met their burden of establishing the voluntariness of Diehl's consent to Munro's search.  Because Munro's entry into the rear of the van was valid, he could lawfully seize Diehl's wallet from the pants as evidence.  Therefore, Diehl's claim regarding this search must be denied.

Unlike Lisbon's request for his pants, there was no reason other than the officer's convenience for Noe to request Lisbon's identification.

[29]    The term "automobile exception" is somewhat of a misnomer, given that the Supreme Court has expressly stated that there is "no general 'automobile exception' to the warrant requirement."  *South Dakota v. Opperman*, 428 U.S. 364, 382 (1976).

AO 72A
(Rev.8/8
2)

readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996).  No separate exigent circumstances need to be shown. *See Maryland v. Dyson*, 527 U.S. 465, 466 (1999).  The validity of the search turns on whether there was probable cause to believe the vehicle contained contraband or evidence of a crime. *Id.*  The mobility requirement is satisfied whenever the vehicle to be searched is operational.  *United States v. Watts*, 329 F.3d 1282, 1286 (11th Cir. 2003).  A functioning vehicle is considered to be "mobile" even if it already has been secured by the police. *See Michigan v. Thomas*, 458 U.S. 259, 261 (1982) (explaining that officers may conduct a warrantless search of an automobile even after the vehicle is impounded and in police custody); *United States v. Birdsong*, 982 F.2d 481, 483 (11th Cir. 1993) (holding that automobile exception applied even though the defendant already had been taken into custody and the police were in

---

Rather, this term of art is better understood as simply embracing the now-settled doctrine that it is permissible to conduct a warrantless search of an automobile, and any containers found therein, provided that, at the time of the search, there is probable cause to believe that contraband or evidence is secreted at some unspecified location within the automobile. *California v. Acevedo*, 500 U.S. 565 (1992); *United States v. Ross*, 456 U.S. 798 (1982).  Of course, if the police have probable cause to believe that contraband is located in a specific area of the automobile, then a warrantless search of the entire automobile is impermissible. *See Arkansas v. Sanders*, 442 U.S. 753 (1979).

65

AO 72A
(Rev.8/8
2)

possession of his car keys).  Police have probable cause to search a vehicle " 'when under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in the vehicle.' " *United States v. Lindsey*, 482 F.3d 1285, 1293 (11th Cir. 2007) (quoting *United States v. Tamari*, 454 F.3d 1259, 1264 (11th Cir. 2006)); *see also United States v. Lanzon*, 639 F.3d 1293, 1300 (11th Cir. 2011) (same).  A police officer's subjective reasons for a search do not control the legal justification for his actions, as long as objective circumstances justify the search. *Lanzon*, *id.* (quoting *Scott*, 436 U.S. at 136).

In this case, the objective evidence satisfied the application of the automobile exception.  First, the Malibu was operational.  Although there was no direct evidence that on the date it was searched the Malibu was mobile, several facts support this conclusion.  A co-defendant had just told law enforcement that he had picked up drug proceeds from Lisbon at Trotti within the last couple of weeks, and he described the vehicle Lisbon drove (the subject car).  That same vehicle was observed at Trotti a few weeks before by surveillance agents.  The keys to the vehicle were in Lisbon's pants pocket, and, most significantly, Lisbon left his wallet (and other keys) in the vehicle, apparently overnight.  These facts demonstrate that the Malibu was operational, and the fact that Lisbon was in custody and his vehicle was parked in its designated space in

66

a controlled-access parking facility are irrelevant to the legitimacy of the warrantless search.

Second, there was a fair probability that contraband or evidence of a crime would be located in the vehicle. Lisbon received large quantities of cocaine at the Trotti address and elsewhere. [Doc. 203-1 at 25]. One of his co-conspirators also had recently picked up drug proceeds from him at Trotti. [*Id.*]. This same co-conspirator was familiar with the vehicle he drove, and that vehicle was observed by agents outside the Trotti location - - which was not his residence - - within a few weeks of Lisbon's arrest. The co-conspirator told law enforcement that Lisbon drove that vehicle in conducting his drug trafficking business. Agents reasonably could conclude, therefore, that evidence of Lisbon's ongoing drug-trafficking enterprise would be located in the vehicle that he used to travel back and forth between his residence and a location that he used in furthering his drug business.

Since there was probable cause to believe that evidence of Lisbon's drug trafficking was located in the vehicle, the officers were authorized to enter the Malibu and search it.

67

4.      *Seizure of wallet and second set of keys, and
        subsequent searches*

Having found that there was probable cause to search the Malibu, the Court

agrees with the government that *United States v. Johns*, 469 U.S. 478 (1985),

authorized the seizure of the wallet and second set of keys, and their subsequent search

back at DEA headquarters.  *Id.* at 484 ("There is no requirement that the warrantless

search of a vehicle occur contemporaneously with its lawful seizure . . . [since] [t]he

justification to conduct such a warrantless search does not vanish once the car has been

immobilized.") (internal citations and quotation marks omitted); *United States v.

Strickland*, 902 F.2d 937, 942 (11th Cir. 1990) ("A vehicle search conducted pursuant

to probable cause may include any item and compartment in the car that might contain

the object of the search.") (citing, *inter alia*, *Colorado v. Bertine*, 479 U.S. 367, 375

(1987), and *Johns*, 469 U.S. at 484).  Thus, the wallet was properly searched because

evidence of Lisbon's drug trafficking would reasonably be located therein.  Moreover,

in addition to helping establish Lisbon's access to and dominion over other locations,

the second set of keys contained keys to safe-deposit boxes, which an officer

reasonably could conclude were likely to contain evidence or proceeds of Lisbon's drug

trafficking.  *Cf. United States v. Schultz*, 14 F.3d 1093, 1098 (6th Cir. 1994) (upholding

68

a search of safe-deposit boxes at bank where affidavit connected boxes and defendant's trafficking in illegal drugs only by stating that officer's training and experience led him to believe that evidence would be located there); *see also* Noe affidavit in support of Trotti search warrant ("Drug traffickers commonly will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services, (i.e., *safe deposit boxes*, securities, cashier's checks, money drafts, letters of credit brokerage houses, real estate, shell corporations and business fronts)," located in Doc. 203-1 at 11-12 (emphasis supplied).

Therefore, since the Court concludes that Lisbon's wallet and second set of keys were properly searched, the search warrants for the safe-deposit boxes were not tainted by any unlawful warrantless search.  As a result, the undersigned **RECOMMENDS** that Lisbon's motions to suppress the fruits of the search warrants for the safe-deposit boxes be **DENIED**.[30, 31]

---

[30]    The Court notes that Lisbon did not make an independent motion to suppress the seizure of funds in any bank accounts, nor did he make any request in any motion to suppress the seizures of these accounts.  [*See* Doc. 178; Doc. 194 at 1 (seeking suppression of evidence from Trotti, W. Ponce, vehicles and "searches of safe deposit boxes with Bank of America, Wachovia Bank and SunTrust Bank"); Doc. 256 (addressing timeliness of challenges to safe-deposit-box search warrants).  The first indication the Court had that Lisbon was challenging the seizures of the bank accounts was a single clause on page 10 of his "Second Amended Motion to Suppress," [Doc. 256], where he wrote "[t]hese facts raise numerous questions regarding the

69

In the event the District Court disagrees with this analysis, the Court evaluates the government's other arguments directed toward avoiding suppression.

The government first argues that the cell phones and the Malibu would have been searched pursuant to the warrant issued and executed later that day, and thus suppression is not warranted under the inevitable-discovery doctrine.   In *Nix v.*

_____

legality of the searches of the safe deposit boxes and seizure of their contents, including the alleged showing of probable cause to the Magistrate Judge in securing the search *and seizure* warrants . . . ."   [*Id.* at 10 (emphasis added)].   In any event, having concluded that the Malibu and its contents were properly searched, any seizure warrants were not tainted by the warrantless search.

[31]   Similarly, there is no merit to Lisbon's *Franks* argument.   Under *Franks*, a defendant may challenge a search-warrant affidavit through a *Franks* hearing if he: (1) makes a substantial preliminary showing that the affidavit contains a deliberately false statement or a statement made with reckless disregard for the truth; and (2) shows that the statement is material, i.e., necessary for making a probable-cause finding.   *United States v. Sarras*, 575 F.3d 1191, 1218 (11th Cir. 2009) (citing *Kapordelis*, 569 F.3d at 1309, and *Franks*, 438 U.S. at 155-56).   When a *Franks* hearing is held, a court will suppress evidence stemming from a search warrant when: (1) the defendant shows by a preponderance of evidence that the search-warrant affidavit contains perjurious statements or statements made with a reckless disregard for the truth; and (2) the search warrant is no longer supported by probable cause after setting aside the perjurious or reckless statement.   *See United States v. Novaton*, 271 F.3d 968, 986 (11th Cir. 2001).   Even assuming that *Franks* is implicated when a search-warrant affidavit does not accurately explain how law enforcement acquired the evidence asserted in support of a request for a search warrant, *see*, *e.g., United States v. Johnson*, 265 Fed. Appx. 757, 758-59 (11th Cir. Feb. 13, 2008) (holding that defendant did not meet *Franks* burden where affidavit did not include information from allegedly unlawful protective sweep), as noted in the text, the evidence from the Malibu was lawfully seized.

70

*Williams*, 467 U.S. 431 (1984), the Supreme Court recognized that evidence obtained by unconstitutional means should not be suppressed "if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police. . . ." *Nix*, 467 U.S. at 447; *United States v. Khoury*, 901 F.2d 948, 959-60 (11th Cir. 1990); *see also United States v. Virden*, 488 F.3d 1317, 1322 (11th Cir. 2007) (stating that government's burden was to establish by a preponderance of the evidence that the information would have ultimately been recovered by lawful means) (citing *Nix*, 467 U.S. at 434). The mere assertion by law enforcement that the information would have been inevitably discovered is not enough. *Virden*, 488 F.3d at 1322 (citing *United States v. Brookins*, 614 F.2d 1037, 1048 (5th Cir. 1980)). Instead, the Eleventh Circuit's rule is that in order to establish inevitable discovery the prosecution must show that " 'the lawful means which made discovery inevitable were being *actively pursued* prior to the occurrence of the illegal conduct.' " *Virden*, *id.* (quoting *Jefferson v. Fountain*, 382 F.3d 1286, 1296 (11th Cir. 2004)) (emphasis in original); *see also Khoury*, 901 F.2d at 960; *United States v. Drosten,* 819 F.2d 1067, 1070 (11th Cir. 1987); *United States v. Satterfield*, 743 F.2d 827, 847 (11th Cir. 1984). "This second requirement is especially important. Any other rule would effectively eviscerate the exclusionary rule,

71

because in most illegal search situations the government could have obtained a valid search warrant had they waited or obtained the evidence through some lawful means had they taken another course of action." *Virden*, 488 F.3d at 1322-23 (citing *United States v. Hernandez-Cano*, 808 F.2d 779, 784 (11th Cir. 1987)).

Here, the government did not prove that the search warrant for W. Ponce was being actively pursued at the time of the warrantless seizures at the time of Lisbon's arrest. In fact, the evidence is undisputed that Noe did not prepare the application for the search warrant until after he returned to his office following Lisbon's arrest and the execution of the Trotti warrant. T1-12, T1-64. As a result, the inevitable-discovery doctrine does not save the warrantless seizure of the cell phones or contents of the Malibu (if the District Court concludes the seizure of the cell phones and the search of the Malibu without a warrant were unlawful).

The government next argues that the independent-source doctrine also averts suppression of the Bank of America and SunTrust safe-deposit boxes if the search of the Malibu and the seizure and search of the wallet and second set of keys are found to be unlawful. Under the independent-source doctrine, even where a Fourth Amendment violation has occurred, evidence "obtained from a lawful source, independent of the illegal conduct" is admissible. *United States v. Davis*, 313 F.3d 1300, 1303 (11th Cir.

72

2002); *see also Segura v. United States*, 468 U.S. 796, 805 (1984) (explaining that the exclusionary rule is not implicated when the government learned of the challenged evidence from an independent source). The rationale for the independent-source doctrine is that the government should be put "in the same, not a worse, position tha[n] [it] would have been in if no . . . error or misconduct had occurred." *Murray v. United States*, 487 U.S. 533, 537 (1988) (quoting *Nix*, 467 U.S. at 443). "[W]here law enforcement makes an initial warrantless entry of a residence and then obtains a search warrant, 'if the search warrant was obtained based upon information from an independent source, then the warrantless entry, even though illegal, [does] not require exclusion of [the] evidence.' " *United States v. Jones*, No. 10-13912, 2011 WL 2672554, *2 (11th Cir. July 11, 2011) (quoting *Glinton*, 154 F.3d at 1254) (first alteration added).[32]

_____

[32]   As Justice Scalia explained in *Murray*, the inevitable-discovery doctrine is a close relative of the independent-source doctrine. *Murray*, 487 U.S. at 539. Under the inevitable-discovery doctrine, unlawfully obtained evidence that "inevitably would have been discovered by lawful means" is admissible. *Nix*, 467 U.S. at 444. Because unlawfully obtained evidence so admitted is not in fact lawfully "rediscovered," but only inevitably would have been, it is not admissible under the independent-source doctrine, which requires lawful discovery of the evidence. *See Murray*, 487 U.S. at 538–39.

AO 72A
(Rev.8/8
2)

The Eleventh Circuit requires district courts confronting an affidavit for the search warrant that contains information obtained as a result of the initial warrantless entry, to "look to whether the other information provided in the affidavit is sufficient to support a probable cause finding." *United States v. Chaves*, 169 F.3d 687, 692 (11th Cir. 1999). "If so, suppression is not required . . . provided . . . that 'the agents' decision to seek the warrant was not prompted by what they had seen during the initial entry.' " *Chaves*, 169 F.3d at 692–93 (quoting *Murray*, 487 U.S. at 542). The government bears the burden to establish, by a preponderance of the evidence, that the search was an independent source of the evidence in question. *Nix*, 467 U.S. at 444 & n.5 ("If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . the evidence should be received.")

As in the case of inevitable discovery, the government did not satisfy its burden. First, it concedes that it had no independent information concerning the one Wachovia Bank safe-deposit box that contained evidence or proceeds other that the safe-deposit-box keys and the information about it in Lisbon's wallet. [Doc. 293 at 10]. Second, Noe testified that as a result of seeing financial records involving bank accounts at Trotti and W. Ponce, he directed that banks be called to determine if there

74

was any money left in those accounts.  T2-10-15.  And, although he later testified that he would generally ask for "any and all records regarding that individual at the bank," T2-15, that response still does not satisfy the independent-source doctrine's requirement that " 'the agents' decision to seek the warrant was *not prompted* by what they had seen during the initial entry.' " *Chaves*, 169 F.3d at 692–93 (quoting *Murray*, 487 U.S. at 542) (emphasis added).  Noe's request to some other agent to call the banks was clearly prompted by his discovery of the safe-deposit keys and search of Lisbon's wallet following the entry into the Malibu, and thus his general routine would not act to save the fruits of the initial warrantless search of the Malibu if the District Court found that such a search was not support by probable cause and the vehicle's mobility.

However, because the Court concludes that the searches conducted by warrants and without warrants were lawful, the undersigned **RECOMMENDS** that Lisbon's motions to suppress, [Doc. 178, 194 and 256], be **DENIED**.

### Motion to Sever

In this motion, [Doc. 180], Lisbon argues that Rule 14 of the Federal Rules of Criminal Procedure requires his severance from his co-defendants because a joint trial would be highly prejudicial to him.  In support, he argues that he is only named in Count One of a multiple-count indictment, he is the only non-Hispanic and non-

75

Spanish-speaking individual named in the indictment, there is very little evidence against him compared to some of his co-defendants, and - - although acknowledging that such an argument is not yet ripe - - he will be prejudiced by co-defendants' defenses that are antagonistic to his.

Rule 14(a) provides:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Fed. R. Crim. P. 14(a).  Thus, Rule 14(a) of the Federal Rules of Criminal Procedure allows for severance if joinder "appears to prejudice a defendant or the government."  However, "there is a preference in the federal system for joint trials of defendants who are indicted together."  *Zafiro v. United States*, 506 U.S. 534, 537 (1993); *see also United States v. Alvarez*, 755 F.2d 830, 857 (11th Cir. 1985) ("The general rule in [the Eleventh Circuit] is that defendants who are jointly indicted should be tried together, and this rule has been held to be particularly applicable to conspiracy cases.").  Rule 14(a) requires "a [district] court to balance the rights of the defendant[ ] and the government to a trial that is free from the prejudice" against the public interest in judicial economy.  *United States v. Novaton*, 271 F.3d 968, 989 (11th Cir. 2001)

76

(internal quotation marks omitted) (reviewing the denial of a codefendant severance motion).

A severance under Rule 14 of the Federal Rules of Criminal Procedure should be granted only if the defendant can demonstrate that a joint trial would result in specific and compelling prejudice to the conduct of his defense.  *United States v. Marszalkowski*, 669 F.2d 655 (11th Cir. 1982).  The test for compelling prejudice is "whether under all the circumstances of a particular case, as a practical matter, it is within the capacity of the jury to follow the [instructions] and accordingly . . . appraise the independent evidence against each defendant's own acts, statements and conduct." *United States v. Kabbaby*, 672 F.2d 857 (11th Cir. 1982).  Conclusory allegations do not satisfy the defendant's burden, since courts presume that jurors can compartmentalize evidence by respecting limiting instructions specifying what evidence may be considered against what defendant.  *United States v. Blankenship*, 382 F.3d 1110, 1123 (11th Cir. 2004) (citing *United States v. Schlei*, 122 F.3d 944, 984 (11th Cir. 1997)); *see also United States v. Duzac*, 622 F.2d 911, 912 (5th Cir. 1980) (holding severance not necessary upon defendant's "generalized vague and speculative assertions"  that co-defendant might testify for him were there not a joint trial).

77

In satisfying this burden, it is not enough for the defendant to show that acquittal would be more likely if he was tried separately, since some degree of bias is inherent in a joint trial. *Alvarez*, 755 F.2d at 857 (citing *United States v. Walker*, 720 F.2d 1527, 1533 (11th Cir. 1983), and *Marszalkowski*, 669 F.2d at 660). Furthermore, a defendant does not suffer "compelling prejudice" simply because much of the evidence at trial is applicable only to his co-defendants. *Id.* (citing *United States v. Zielie*, 734 F.2d 1447, 1464 (11th Cir. 1984), and *United States v. Berkowitz*, 662 F.2d 1127, 1135 n.8 (5th Cir. Unit B Dec. 1981)); *see also United States v. Cassano*, 132 F.3d 646, 651 (11th Cir. 1998) (same). Also, evidence of the reputation or past crimes of a co-defendant does not ordinarily justify severance. *See United States v. Howell*, 664 F.2d 101, 106 (5th Cir. 1981); *United States v. Ocanas*, 628 F.2d 353, 359 (5th Cir. 1980); *United States v. Perez*, 489 F.2d 51, 67 (5th Cir. 1973), and cases cited therein.

Even if a defendant can show some prejudice, a defendant is entitled to severance only if that "prejudice flowing from a joint trial is clearly beyond the curative powers of precautionary instruction." *United States v. Morrow*, 537 F.2d 120, 126 (5th Cir. 1976); *Puiatti v. McNeil*, 626 F.3d 1283, 1310 (11th Cir. 2010) (recognizing that defendant seeking severance has a "heavy burden" of demonstrating compelling prejudice, which occurs only where there is a serious risk that a joint trial (1) "would

78

compromise a specific trial right of one of the defendants," or (2) would "prevent the jury from making a reliable judgment about guilt or innocence.") (citations omitted); *see also United States v. Walser*, 3 F.3d 380, 385 (11th Cir. 1993) (recognizing that a court errs in denying a severance motion if the denial "result[ed] in compelling prejudice against which [it] could offer no protection").  Demonstrating compelling prejudice is "a heavy burden." *United States v. Hogan*, 986 F.2d 1364, 1375 (11th Cir. 1993).  "The test for assessing compelling prejudice is whether under all the circumstances of a particular case it is within the capacity of jurors to follow a court's limiting instructions and appraise the independent evidence against a defendant solely on that defendant's own . . . conduct in relation to the allegations contained in the indictment and render a fair and impartial verdict." *United States v. Hersh*, 297 F.3d 1233, 1243 (11th Cir. 2002); *Walser*, 3 F.3d at 386-87.  If so, "though the task be difficult," there is no compelling prejudice. *Id.* (citation omitted).  If the prejudice may be cured by a cautionary instruction, severance is not required. *Walser*, 3 F.3d at 387; *Jacoby*, 955 F.2d 1527, 1542 (11th Cir. 1992).

Finally, whether to grant a motion to sever involves an exercise of the court's considered discretion. *Jacoby*, 955 F.2d at 1542.

79

Viewed through this analytical prism, Lisbon's motion for severance is due to be denied. There is a preference for trying indicted defendants together, and Lisbon has not met his "heavy burden" of establishing compelling prejudice mandating severance. After all, the District Court is likely to instruct the jury on the substance of Eleventh Circuit Pattern Jury Instruction (Criminal) 10.2 (2003) [Caution - - Punishment (Single Defendant - - Multiple Counts)], which provides, in relevant part:

> A separate crime or offense is charged in each count of the indictment. Each charge and the evidence pertaining to it should be considered separately. The fact that you may find the Defendant guilty or not guilty as to one of the offenses charged should not affect your verdict as to any other offense charged.

This is similar to the charge given in *Walser*, 3 F.3d at 387, and which was found to contribute to a finding that the defendant was not deprived of a fair trial due to prejudicial joinder. A jury is presumed to be able to follow the court's instructions and evaluate the evidence as to each count independently. *See United States v. Badia*, 827 F.2d 1458, 1466 (11th Cir. 1987) (multiple defendants).

Therefore, Lisbon is not entitled to severance, and the undersigned **RECOMMENDS** that his motion for severance, [Doc. 180], be **DENIED**.

80

**Conclusion**

For the above reasons, the undersigned **RECOMMENDS** that Lisbon's motions to suppress, [Docs. 178, 194 and 256], and to sever, [Doc. 180], be **DENIED**.

**IT IS SO RECOMMENDED**, this the 13th day of October, 2011.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

81